IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PURE EARTH, INC. | : | CIVIL ACTION |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| GREGORY W. CALL | : | No. 09-4174 |

Davis, J.                                                                                      March 21, 2012

<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

**I. Introduction**

    This action arises out of the events surrounding the acquisition of Casie Ecology Oil

Salvage ("Casie"), MidAtlantic Recycling Technologies, Inc. ("MART"), and Rezultz, Inc.

("Rezultz") (collectively referred to as the "Companies") by Pure Earth, Inc. ("PEI").  In

February of 2007, Pure Earth entered into an agreement, dubbed the Stock Purchase Agreement

("SPA"), with Gregory Call, the majority owner of the Companies, to detail the terms of the

acquisition.  Subsequent to the negotiation of the agreement, each party found fault with the

other's performance of its obligations under the SPA, resulting in the instant suit.

    Under the terms of the SPA, Call and the other owners (collectively, the "Sellers") agreed

to sell PEI all of the stock of Casie, MART, and Rezultz.  In exchange, the Sellers were to

receive nine hundred thousand (900,000) shares of unregistered common stock of PEI on the

closing date, three hundred thousand (300,000) shares of unregistered common stock of PEI two

hundred ten (210) days after the closing date, and four hundred thousand (400,000) shares of

common stock upon the occurrence of certain contingencies.  (PEI Ex. 1 at 2.)  The SPA further

provided that, on the closing date, the Companies would make partial payment to Call on a loan that Call had previously extended to the Companies and deliver a subordinated promissory note for the amount that remained due and owing after they made the partial payment to Call.  (Call Ex. 69 at 01473.)  In addition, PEI and Call negotiated a separate agreement to employ Call as the CEO of one of the Companies and as a member of PEI's board of directors.

Subsequent to the execution of the original agreement, the parties negotiated several amendments to the SPA.  After the closing date, March 30, 2007, the parties entered into a final amendment, the Fifth Amendment, which resolved an alleged shortfall of $6.7 million that existed in the net asset value of the Companies at the time of closing.  (See generally Call Ex. 69.)  Pursuant to the Fifth Amendment, the Sellers returned eight hundred and ten thousand shares (810,000)[1] of the (900,000) shares of stock they received.  (Id. at 01473.)   In addition, the Sellers agreed that they were not entitled to receive the additional three hundred thousand (300,000) shares of stock negotiated under the original agreement.   (Id.)  PEI also converted a portion of the amount owed to Call under the loan to shares of PEI stock and entered into a new promissory note with Call, under which it owed Call $1,000,000.  (Id.)  Finally, PEI issued a specified amount[2] of unregistered shares of common stock to the Sellers.  (Id.)

Despite the resolution of the valuation disagreement, the relationship between the parties continued to deteriorate.  These disagreements ultimately culminated in the termination of Call

---

[1] PEI also took into its account 53,922 shares from another minority owner of the former Call Companies, pursuant to a provision of the original contract.

[2] The Sellers collectively were to be issued three hundred and thirty two thousand five hundred and seventy two (332,572) shares of unregistered PEI stock under the Fifth Amendment to the Stock Purchase Agreement.

from his position as CEO, and the filing of the instant lawsuit by PEI.  In particular, PEI alleges

that Call is obligated to indemnify it for losses incurred as a result of alleged breaches of the

warranties detailed within the text of the SPA.  In turn, Call has filed a counterclaim and third-

party claims against Mark Alsentzer and Brent Kopenhaver, CEO and CFO of PEI respectively,

asserting breach of contract and warranty[3] and securities fraud.  Call alleges that he was tricked

into signing the SPA, on the basis of three material misrepresentations: (1) the alleged failure to

disclose an investigation by the New York City Business Integrity Commission ("BIC") into the

connections between Juda Construction, Ltd. ("Juda"), a wholly owned subsidiary of PEI, and

organized crime (2) the alleged misrepresentation that PEI had won a multi-million dollar

contract to provide waste treatment services for the World Trade Center site, and (3) alleged false

statements regarding the amount of business that PEI would bring to the Call Companies.

To resolve this dispute, we conducted a bench trial that concluded on November 15,

2011.  Having thoroughly considered the documentary evidence and testimony, we make

findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).  To

begin, the credible evidence does not entirely support the contentions of either party.  Neither

side presented sufficient corroborative documentary evidence to adequately support their

positions, instead choosing to advance subjective factual conclusions, thereby leaving the

resolution of this case to turn, in large part, on our assessment of the credibility of the witnesses.

What testimony do we believe, and what inferences do we draw from that testimony?

Unfortunately, none of the parties were fully open and honest with this Court, instead choosing to

---

[3] Pursuant to this Court's January 13, 2011 Order, the breach of contract and warranty claim exists only as to PEI, and not as to the Alsentzer and Kopenhaver.

practice their accomplished skills in shaping the perception of events rather than providing a dispassionate and trustworthy rendition of the facts.[4]  The credibility of each of the principal witnesses falls well below our comfort zone and we find as a fact that all were deliberately untruthful on important matters.  We have rarely had greater distrust of a collection of witnesses presented at trial.[5]  With this cautious and restrained eye, we review the proceedings in this matter.

Given the volume of claims asserted by the Plaintiff and the number of contract provisions concerned with respect to each claim, we have created a separate set of factual findings and legal conclusions for each claim, contained within one section.  A more comprehensive section involving legal conclusions general to all of the Plaintiff's claims for indemnification follows these more specific conclusions.

---

[4] We immediately shared our distrust of the witnesses with counsel during argument. (Trial Tr. vol. II, 262-3, 334-5, 339, 345-7, November 15, 2011.)

[5] This is not the only occasion a fact-finder has found that the PEI principals engaged in grossly deceptive practices.  In 2010, the New York City Business Integrity Commission ("BIC") denied the application of Pure Earth, Inc., and Juda Construction for a license to operate a trade waste business.  In doing so, BIC found that Pure Earth had entered into business relationships with prohibited persons, convicted racketeers Christopher Uzzi and Thomas and Joseph Attonito. The three had accumulated extensive criminal histories, including convictions for fraud, extortion and racketeering, and consequently all were barred from participating in NYC waste hauling enterprises.  Despite their assurances that Pure Earth and Juda Construction would not employ or otherwise retain the services of persons lacking good character and integrity, Pure Earth engaged Uzzi as the "President" of Pure Earth and contracted with Thomas Attonito as a "consultant" at the rate of $208,000 in annual compensation.  The business relationship with the Attonitos was concealed from BIC, only to be discovered by the on-the-scene BIC monitor.  The Commission concluded that Pure Earth, the applicant before it, "intentionally misled the Commission . . . to hide the true ownership and management of [PEI].   The Commission concluded that Pure Earth and its subsidiary, Juda, lack "good character, honest and integrity." (Call Ex. 63 at 11, 13-15, 21.)

**II. General Factual History and Procedural Background**

1.  On February 13, 2007, PEI entered into a Stock Purchase Agreement ("SPA") with Call, with a closing date of March 30, 2007.  Pursuant to the SPA, PEI acquired all of the outstanding shares of Casie Ecology Oil Salvage, Inc. ("Casie"), MidAtlantic Recycling Technologies, Inc. ("MART"), and Rezultz, Inc. ("Rezultz"), (collectively, the "Companies").  Call was the majority owner, but not the sole owner, of the stock of the Companies.  (See generally PEI Ex. 1.)  Mark Alsentzer and Brent Kopenhaver were the CEO and CFO, respectively, of PEI.

2.  Under the SPA, the Sellers were to receive PEI stock valued at $4.5 million (900,000 shares at a negotiated and agreed upon value of $5 per share) in exchange for their shares in the Companies.  At the time of the negotiation of the contract, Call owned eighty-nine percent (89%) of the outstanding stock of MART, eighty-one percent (81%) of the outstanding stock of Casie, and ninety percent (90%) of the outstanding stock of Rezultz. (See generally PEI Ex. 1.)

3.  The purchase price was to be based upon the Net Asset Value of Call's Companies, as referenced in the Companies' December 31, 2005 financial statements, which were prepared by Ed Avena.

4.  The parties agreed in the SPA that following closing they would restate the Net Asset Value of the Companies in accordance with generally accepted accounting principles (GAAP) and adjust the purchase price accordingly to account for any deficiency.  (PEI Ex. 1 at 2-3.)

5.  A reconciliation was to occur in 2007, for which a separate evaluation for the period ending on March 30, 2007, the date of the closing, would occur.  This net asset valuation was to be conducted in accordance with GAAP.  Call was aware that such a reconciliation was to occur.

6.  Both PEI and Call were represented by sophisticated legal counsel in the negotiations.  PEI was represented by Stradley Ronon Stevens & Young, LLP, and Call was represented by Flaster Greenberg, P.C.

7.  In addition, Call also received professional advice from Edward Avena, an accountant, and Everingham & Kerr.

8.  Skoda Minotti, an accounting firm employed by PEI, initially calculated a net asset shortfall.

9.  Call hired Glenn Josephs to review all of the calculations of Skoda Minotti.  Josephs found that Skoda Minotti's calculation of the net asset shortfall was excessive.

10.     The ultimate net asset shortfall was recalculated in part to account for the findings of Josephs.  The ultimate net asset shortfall agreed to by the parties, as memorialized in the Fifth Amendment to the SPA, was $6,763,037.10.  (See Call Ex. 69.)

11.     Call executed the SPA on behalf of himself and the Companies.

12.     Call read and understood the SPA before he executed it.

13.     The SPA was a carefully negotiated and comprehensive agreement between the parties and their counsel.  The SPA contained all of the promises that the parties made to each other, including forty-six detailed and specific representations and warranties.

14.     The SPA contains an integration clause, which provides as follows:

    14.6 Entire Understanding: Amendment.  This Agreement, together with the Exhibits and Schedules hereto, states the entire understanding between the Parties with respect to the subject matter hereof and supersedes all prior oral and written communications and agreement with respect to the subject matter hereof. This Agreement shall not be amended or modified except in a written document signed by all Parties. (PEI Ex. 1 at § 14.6.)

15.     Call understood the integration clause to mean that all promises made between PEI and himself were included in the SPA, and understood the SPA to supercede all prior oral communications and agreements that Call had with anyone acting on behalf of PEI.

16.     The SPA contains representations and warranties that Call, as the seller of the Companies, extended to PEI.  PEI also made representations and warranties to Call within the text of the SPA.

17.     Section 7.10 of the Stock Purchase Agreement, contains a representation and warranty from PEI that provides as follows:

    Disclosure.  No representation or warranty or other statement made by Buyer in this Agreement, the Buyer Closing Documents or the Schedules or otherwise in connection with the transactions contemplated hereby contains any untrue statement or omits to state a material fact necessary to make any of them, in light of the circumstances in which it was made, not misleading.  (PEI Ex. 1 at § 7.10.)

18.     Section 7.8 of the SPA contains the following representation and warranty from PEI:

"Except as set forth in Schedule 7.8 (a), no Proceeding[6] involving, or related to Buyer or Buyer's business is currently pending." (PEI Ex. 1 at § 7.8)

19. Schedule 7.8 to the SPA lists three matters identified as "proceedings" and five "judgments" which involved Juda Construction, Ltd. ("Juda"), a PEI subsidiary. (PEI Ex. 1-1(a).)  The presence of the BIC Monitor at Juda was not identified as a "proceeding".

20. On September 14, 2009, PEI commenced this action by filing a Complaint against Call seeking indemnification for Call's asserted  breach of numerous representations and warranties contained in the SPA that constitute "Adverse Consequences" under the SPA. (Doc. No. 1.)

21. On November 6, 2009, Call responded to PEI's Complaint by filing an Answer, Amended Counterclaim, Third-Party Complaint and Jury Demand against PEI, Alsentzer, and Kopenhaver.  (Doc. No. 12.)

22. In the Amended Counterclaim, Call asserts that Alsentzer and Kopenhaver made material misrepresentations during the course of the negotiations for the SPA.  (Doc. No. 12.)

23. Specifically, Call alleges that Alsentzer and Kopenhaver told him in pre-contract negotiations that: (1) a combination of PEI and the Companies would form a synergistic relationship that would provide the Companies with access to the New York City market; (2) PEI had won a significant contract to haul waste from the World Trade Center site ("WTC Project") and that waste from the WTC Project would be brought to the Companies; and (3) the Companies would receive 100,000 tons of waste from another PEI project, referred to as the "Rego Park Project."  Call also alleges that in pre-contract negotiations Alsentzer and Kopenhaver provided Call with false pro forma financial projections and concealed a three-year long "investigation" conducted by BIC into Juda. (Doc. No. 12 at 13-25.)

---

[6]"Proceeding" is defined as an [a]ction, arbitration, audit, hearing, investigation, litigation or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private) commenced, brought, conducted or heard by, otherwise involving, any Governmental Body or arbitrator." (PEI Ex. 1 at A-7.)  Governmental Body" is defined as: "any (a) nation, state, county, city, town, borough, village, district or other jurisdiction; (b) federal, state, local, municipal, foreign or other government; (c) government or quasi-governmental authority of any nature (including any agency, branch, department, board, commission, court, tribunal or other entity exercising governmental or quasi-governmental powers); (d) multinational organization or body, (e) body exercising, or entitled or purporting to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power; or (f) official of the foregoing." (PEI Ex. 1 at A-5.)

7

24.     On November 30, 2009, PEI moved to dismiss all of Call's claims, except for his claim that PEI breached the representation and warranty contained in Paragraph 7.8 of the SPA by allegedly failing to disclose the existence of the BIC "investigation."

25.     On May 27, 2010, the Court issued an Order which it granted PEI's motion in part and denied it in part.  (See generally Doc. No. 18.)

26.     As a result of the Court's decision and Call's voluntary dismissal of certain claims, Call's only remaining claims were his breach of contract/warranty claim against PEI (Count Four) and his claim for alleged violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, promulgated thereunder, against the PEI Parties (Count Five).

27.     After the close of discovery, PEI moved for summary judgment on Call's securities fraud claim.  PEI also moved for summary judgment on certain aspects of Call's breach of contract claim.  (See Doc. Nos. 35-41, 46, 48.)

28.     On January 13, 2011, the Court issued an Order granting in part and denying in part the PEI Parties' Motion.  We denied Call's Motion.  (Doc. No. 54.)

29.     Call's remaining claims are for securities fraud against the PEI Parties and for alleged breach of the SPA against PEI.  Call's only remaining claims of misrepresentation are (1) the alleged failure to mention an investigation by the New York City Business Integrity Commission ("BIC") into the connections between Juda Construction, Ltd. ("Juda"), a wholly owned subsidiary of PEI, and organized crime, (2) the alleged misrepresentation that PEI had won a multi-million dollar contract to provide waste treatment services for the World Trade Center site, and (3) alleged false statements regarding the amount of business that PEI would bring to the Call Companies.

30.     PEI's breach of contract claim against Call seeking indemnification for the Adverse Consequences remains pending.  PEI seeks a declaratory judgment that it has the right to set-off the amounts of the Adverse Consequences against the PEI stock owned by Call and promissory note owed to Call.  PEI also seeks monetary damages to the extent that the stock and promissory note are insufficient to cover all of PEI's damages, along with attorney's fees, pursuant to the provisions of the SPA.

## III.    Adverse Consequences Claimed by PEI

1.      Section 11.1 of the SPA provides:

Seller's Obligation to Indemnify.  Seller shall defend, indemnify and hold harmless Buyer, PEI, their respective Affiliates, and their respective Representatives, successors, and assigns (collectively "Buyer Indemnified Parties"), from and against any and all first and third party actions, suits, claims,

demands, debts, liabilities, obligations, losses, damages, costs, and expenses (including without limitation reasonable attorneys', experts' and consultants' fees) (collectively "Adverse Consequences"), arising out of, or in connection with, or caused by, directly or indirectly, any or all of the following: (a) any misrepresentation, Breach or failure of any warranty, representation, agreement, covenant or certification made by the Companies or Seller, in this Agreement or pursuant hereto; . . . . (c) any successful action by Buyer against Seller or the Companies to enforce this Agreement or any of the agreements, documents or instruments contemplated hereby or executed in connection herewith; . . . . (PEI Ex. 1 at § 11.1.)

2.      Section 11.5 of the SPA provides as follows:

Setoff.  In addition to any other rights the Buyer Indemnified Parties may have under this Agreement for indemnification, Buyer, on behalf of the Buyer Indemnified Parties, shall, following ten (10) days' notice to Seller, have the right to setoff against any amounts or other consideration that may be due to Seller (including without limitation, the Shareholder Loan), the amount of any Adverse Consequences incurred or reasonably expected to be incurred by the Buyer Indemnified Parties in connection therewith, accruing from or arising as a result of any breach of the representations, warranties, covenants and obligations made or to be complied with and performed by Seller or any Company pursuant to this Agreement or in any agreement, certificate or instrument delivered by or on behalf of Seller or any Company pursuant hereto.  The setoff rights referenced in the preceding sentence shall not constitute a limitation on the Buyer Indemnified Parties' rights hereunder or as a measure of liquidated damages and the Buyer Indemnified Parties may seek full indemnification for all Adverse Consequences suffered and may pursue all rights and remedies available to them, at law or in equity, against Seller or any Company, without seeking recourse against any other Party.  (PEI Ex. 1 at § 11.5.)

3.      Subsequent to the closing of the SPA, PEI alleged numerous breaches by Call of the representations and warranties contained in the SPA that it claimed constituted "Adverse Consequences" under paragraph 11.1 of the SPA.  PEI provided Call with repeated notice of the alleged breaches.

4.      In this litigation, PEI pursues the following putative breaches: [7]

---

[7] Although Defendant has not raised this issue, we note that Pure Earth's Amended Complaint alleged a somewhat different set of breaches than those listed here.  Subsequent to the completion of discovery and resolution of the summary judgment motion, Plaintiff added two new claims without seeking this Court's permission.  These new claims first appeared in a pretrial memorandum filed in January 2011. (See Doc. No. 56.)  Federal Rule of Civil Procedure

a.      $41,239.00 in professional expenses incurred for the preparation of amended tax returns for the Companies for tax years 2004, 2005, 2006, and the first quarter of 2007, as a result of the Seller's alleged breach of one or more of the covenants, representations and warranties contained in sections 6.4, 6.5, 6.13(a);

b.      $66,561 incurred as fees to the New Jersey Department of Environmental Protection ("NJDEP") associated with (i) certain submissions to the NJDEP relating to the sale of the Companies' capital stock to PEI and (ii) past due fees incurred prior to the Closing Date by Casie and MART, alleged to be the responsibility of Seller that were incurred as an alleged violation of the covenants, representations, and warranties contained in sections 6.2 (b)(iv), 6.4, 6.5, 6.12, 6.13(a), 6.13(f), 6.17(a), 6.17(b), 6.22;

c.      $80,000 incurred as a result of certain legal fees paid to Drinker Biddle in alleged breach of sections 6.4, 6.5, 6.8(a), 6.12 of the SPA;

d.      $30,928 incurred as professional expenses for legal work performed in connection the procurement of approval from the NJDEP for the sale of the Companies to PEI, alleged to be breaches of sections 6.4, 6.5, 6.8(a), 6.12, 6.17(b), and 8.4 of the SPA;

e.      $300,013 incurred because of the purported existence of certain liabilities that existed at the date of the closing balance sheet, which were allegedly not recorded thereon, alleged to be in violation of sections 6.4, 6.5, 6.8(a), and 6.12 of the SPA;

f.      $104,901 incurred as a result of the existence of payments to employees for waiver of medical insurance coverage that were allegedly not disclosed on the Closing Date, alleged to be violations of sections 6.4, 6.5, 6.12, and 6.15 of the SPA;

g.      $87,585 incurred due to the Companies' payment of personal life insurance coverage for Call and another individual in alleged breach of one or more of the covenants, representations, and warranties contained in sections 6.4, 6.5, 6.12, and 6.15 of the SPA;

h.      $2,014,354 incurred as a result of local authorities in Cumberland County,

---

15(b) provides, "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Fed. R. Civ. P. 15. In determining whether an issue was tried by implied consent, a court must consider "(1) whether the parties recognized that the unpleaded issue entered the case at trial, (2) whether the evidence supports that supports the unpleaded issue was introduced at trial without objection, and (3) whether a finding of trial by consent prejudiced the opposing party's opportunity to respond." Douglas v. Owens, 50 F.3d 1226, 1236 (3d Cir. 1995). We find that the Defendant consented to the trial of these claims since he was aware of the newly raised claims well before trial commenced and contested the merits of these claims at trial. Accordingly, despite this procedural irregularity, we cannot find prejudice.

New Jersey, denying PEI the right to use a landfill located in Cumberland County in alleged violation of sections 6.17(a)-(b), 6.22(a)-(g) of the SPA;

i.    Declaratory relief entitling PEI to an award in the amount of a fine from the EPA in an amount to be determined at trial as a result of the Companies' alleged failure to properly process hazardous waste, properly test oil recovered from hazardous waste, commingling of hazardous waste recovered oil with non-hazardous waste recovered oil, shipping of hazardous waste into the stream of commerce without proper manifests and shipping papers, and other related violations, alleged to be violations of sections 6.17(a)-(b), 6.22(a)-(g), and 6.18 of the SPA;

j.    $110,565 that PEI is required to pay to secure the return of a Humboldt SC-3 centrifuge and spare rotating unit from Wisconsin due to repairs authorized by the Companies and alleged to have been made prior to the Closing Date in alleged violation of sections 6.4, 6.5, 6.6, 6.8(a)-(b), 6.9, and 6.12 of the SPA;

k.    $149,906 in damages PEI sustained because certain yellow iron equipment of the companies was allegedly not in satisfactory condition on the Closing Date in alleged violation of one or more of the covenants, representations, and warranties contained in sections 6.6, 6.9, and 6.28 of the SPA;

l.    $85,678 in professional fees incurred by PEI for accounting work PEI was required to perform due to the inadequacy of the books and records of the Companies, which is alleged to constitute a violation of sections 6.4, 6.5, 6.12, and 6.13 of the SPA.

We address these twelve alleged adverse consequences in turn.

4a.    *Amended tax returns*

Plaintiff's Claim

a.    Plaintiff claims that Defendant is liable for $41,239.00 in costs incurred in filing amended tax returns for the Companies for tax years 2004, 2005, 2006, and the first quarter of 2007, as a result of the Seller's alleged breach of one or more of the covenants, representations and warranties contained in sections 6.4, 6.5, and 6.13(a).

Contractual Provisions

b.    Under Section 6.4 of the SPA, the Sellers were required to provide financial statements that "fairly and accurately present the financial condition and the results of operations, changes in shareholders' equity and cash flows of the Companies as and at the respective dates of and for the period referred to in such Financial Statements, all in accordance with

GAAP."[8]  (PEI Ex. 1 at § 6.4)

c.    Section 6.5 of SPA requires that the books of account and other financial records of the Companies are "complete and correct and represent actual, bona fide transactions and have been maintained in accordance with sound business practices, including the maintenance of an adequate system of internal controls." (PEI Ex. 1 at § 6.5.)

d.    SPA 6.13(a) warrants that "The Companies and the Seller (with respect to the Business) have timely filed all Tax Returns that were required to be filed.  All such Tax Returns were true, correct, and complete and have been prepared in compliance with all Legal Requirements.  All Taxes owed by the Companies and the Seller (with respect to the Business) (whether or not shown on any Tax Return) have been paid.  No penalty, interest, or other charge is or will become due with respect to the late filing of any such Tax Return or late payment of any such Tax." (PEI Ex. 1 at § 6.13(a).)

e.    The SPA required that by 12/31/05 Ed Avena would create financial statements in accordance with GAAP for the Call Companies and turn them over to PEI.

<u>Factual Findings</u>

f.    The financial statements completed by Ed Avena for the Call Companies were not prepared in accordance with GAAP.

g.    PEI seeks $41,239.00 in professional expenses incurred by Skoda Minotti in the creation of amended tax returns for the Companies for tax years 2004, 2005, 2006, and the first quarter of 2007.

h.    This claim arises from PEI's desire to become a public company.  To gain this status, PEI was required to present at least two years of certified financial statements which have been verified by CPA as GAAP compliant.

i.    Because the financial statements prepared by Ed Avena did not comply with GAAP, PEI prepared conforming amended financial statements and filed amended tax returns.  These steps were necessary and appropriate.

---

[8] Exhibit A to the SPA defines GAAP as "generally accepted accounting principles for financial reporting in the United States applied on a basis consistent with the basis on which the financial statements were prepared."  (PEI Ex. 1 at A-5.)

j.          Had the original financial statements submitted to PEI been in conformity with GAAP, PEI would have incurred certain costs in obtaining certification of the statements by an independent firm.  However, under these circumstances, the need to file amended tax returns would not have arisen.

<u>Conclusions</u>

k.          Independent of the other provisions, Seller did not breach sections 6.5 or 6.13(a).  No evidence was submitted tending to establish that Seller did not file tax returns for the years prior to the Closing Date.  The accounting method used by the Call Companies, although not in accord with GAAP, was "in accordance with sound business practices." [9]

l.          Defendant breached provision 6.4, as it requires financial statements to be prepared in accordance with GAAP.  Call did not prepare financial statements and tax returns in accordance with GAAP.

m.          The cost of filing the amended tax returns was a consequential damage incurred by Pure Earth attributable to the breach of Section 6.4.  Consequential damages for a breach of contract under Pennsylvania law are recoverable if they "are a natural result of breach, were reasonably foreseeable and contemplated by the party, and provable with reasonable certainty."  <u>Smith v. State Farm Mut. Auto. Ins. Co.</u>, No. 11-7589, 2012 WL 508445, at *5 (E.D. Pa. Feb. 16, 2012)(citing <u>Ferrer v. Trustees of the Univ. of Pa.</u>, 825 A.2d 591, 610 (Pa. 2002))(applying Pennsylvania contract law).  Plaintiff has proven its damages with reasonable certainty, given that it has produced billing records to validate its damages request.  Moreover, a clear causal chain links the failure to render financial statements in accordance with GAAP and the need to file amended tax returns.  Finally, given Call's knowledge that the financial statements provided should have been in accordance with GAAP (<u>see</u> Trial Tr. vol. II, 55, November 15, 2011), and Call's knowledge that PEI sought to take the company public subsequent to the acquisition (<u>see</u> Trial Tr. vol. II, 56, November 15, 2011), the cost of filing amended tax returns as a

_____

[9]PEI operated under an "accrued cost" method of accounting; the Companies operated under a "deferred  revenue" system of accounting.  Skoda Minotti, PEI's accounting firm, spoke of the deferred revenue system in this manner:  "Some would say that the theory would be preferable; consistent with at least one other industry example."  (Call Ex. 91.)  While we do not accept Call's attempt to use the document to prove that Call's method of accounting was in compliance with GAAP, we do note that it illustrates that Call's method was in accordance with sound business practices.

consequence of failing to produce financial statement that comported with GAAP should have been foreseeable to Call.  As a result, the costs of filing the amended tax returns meet the strictures required for the collection of consequential damages.

*4b.*   *NJDEP fees*

<u>Plaintiff's Claim</u>

a.      Plaintiff claims that Call is liable for $66,561 incurred as fees paid to the New Jersey Department of Environmental Protection ("NJDEP") associated with (i) certain submissions to the NJDEP relating to the sale of the Companies' capital stock to PEI and (ii) past due fees incurred prior to the Closing Date by Casie and MART, alleged to be the responsibility of Seller that were incurred as an alleged violation of the covenants, representations, and warranties contained in sections 6.2 (b)(iv), 6.4, 6.5, 6.12, 6.13(a), 6.13(f), 6.17(a), 6.17(b), 6.22 of the SPA.

<u>Contractual Provisions</u>

b.      Under 6.2 (b)(iv), "neither the execution and delivery of [SPA] nor the consummation or performance of any of the transactions contemplated" were meant to "directly or indirectly . . . cause Buyer to become subject to, or to become liable for the payment of any Tax." (PEI Ex. 1 at § 6.2.)

c.      Under Section 6.4 of the SPA, the Sellers were required to provide financial statements that "fairly and accurately present the financial condition and the results of operations, changes in shareholders' equity and cash flows of the Companies as and at the respective dates of and for the period referred to in such Financial Statements, all in accordance with GAAP." (PEI Ex. 1 at § 6.4.)

d.      Section 6.5 of the SPA requires that the books of account and other financial records of the Companies are "complete and correct and represent actual, bona fide transactions and have been maintained in accordance with sound business practices, including the maintenance of an adequate system of internal controls." (PEI Ex. 1 at § 6.5.)

e.      Section 6.12 of the SPA provides that, "The Companies have no Liability except for Liabilities reflected or reserved against in the Financial Statements at December 31, 2005, all of which are accurately reflected on the Companies' books and records." (PEI Ex. 1 at § 6.12.)

f.      SPA 6.13(a) warrants that "The Companies and the Seller (with respect to

14

the Business) have timely filed all Tax Returns that were required to be filed.  All such Tax Returns were true, correct, and complete and have been prepared in compliance with all Legal Requirements.  All Taxes owed by the Companies and the Seller (with respect to the Business) (whether or not shown on any Tax Return) have been paid.  No penalty, interest, or other charge is or will become due with respect to the late filing of any such Tax Return or late payment of any such Tax." (PEI Ex. 1 at § 6.13(a).)

g.          6.13 (f) provides that, "No assessment for the deficiency for any Tax has been proposed, asserted or assessed against any Companies or Seller with respect to taxable periods ended on or before the Closing Date which has not been resolved, paid in full or fully reserved in accordance with GAAP in the Financial Statements . . . . Each of the Companies has fully accrued or reserved in the Financial Statements all Taxes of such Company for any periods prior to the Closing Date that are not yet due and payable as of the Closing Date and has made adequate provision in the financial statements for all current taxes and assessments for which such Company is or may be held liable, and the unpaid taxes of the Company and/or Seller (with respect to the Business) (i) did not on December 31, 2006 and do not exceed the reserve for tax liability (rather than any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the December 31, 2006 balance sheet of the Companies included in the Financial Statements, and (ii) do not exceed the reserve as adjusted for the passage of time through the Closing Date in accordance with past customs and practice of the Companies and/or Seller (with respect to the Business) in filing its Tax Returns." (PEI Ex. 1 at § 6.13(f).)

h.          SPA 6.17(a) provides that, "the operation of the Business, the conduct of the Business as where such business has been conducted, the hiring, terminating, and compensating and otherwise managing or dealing with employees, and the ownership, possession and use of the Assets used in or for the Business, comply and have complied with all Legal Requirements applicable to the Companies, their operations, the Business, the Assets and the Liabilities.  The Companies have obtained and hold all Governmental Authorizations required for the lawful operation of the Business as and where such business is presently conducted."  (PEI Ex. 1 at § 6.17.)

i.          6.17(b) provides,"Except as set forth in Schedule 6.17, all such Governmental Authorizations are in full force and effect, no violations are or have been recorded in respect of any Governmental Authorization and no proceeding is pending or threatened to enforce, revoke, terminate or

limit any Governmental Authorization.  Except as set forth in Schedule 6.17, no Company is in default, and has not received any notice of any claim of default, with respect to any such Governmental Authorization or of any notice of any other claim or Proceeding (or threatened Proceeding) relating to any such Governmental Authorization.  Except as set forth in Schedule 6.17, all such Governmental Authorizations shall survive a change in ownership of the Companies without the Consent of any Person and shall remain in full force and effect immediately following the Closing."  (PEI Ex. 1 at § 6.17.)

j.      Section 6.22 provides that except as disclosed in Schedule 6.22,

   i.      (a) "Each Company, the Business and the Assets used in or for the Business are, and at all times have been, in full compliance with, and have not been and are not in violation of or liable under, any Environmental Law.[10]  No Company has any basis to expect, nor has it or any other Person for whose conduct it is or may be held to be responsible received, any actual or threatened order, notice or other communication from (i) any Governmental body or private citizen acting in the public interest, (ii) the current or prior owner or operator of any Facilities, or (iii) any other Person, of any actual or potential violation or failure to comply with any Environmental Law, or of any actual or threatened obligation to undertake, bear the cost of or otherwise be responsible for any Environmental, Health, and Safety Liabilities including with respect to any Facility or other property or asset (whether real, personal, or mixed) in which any Company has or had an interest, or with respect to any property or Facility at or to which Hazardous Materials were generated, manufactured, refined..."

   ii.      (b) "There are no pending or threatened claims, Encumbrances,[11] or other restrictions of any nature resulting from any Environmental, Health and Safety Liabilities or arising under or pursuant to any Environmental Law including with respect to or affecting any Company, the Business, the Assets used in or for the Business, or any Facility or other property or asset (whether real, personal or mixed) in which the Company has or had

---

[10]Environmental Law is defined on A-4 of PEI ex. 1.

[11]Encumbrance is defined as "any charge, claim, community or other marital property interest . . . ." (See PEI Ex. 1 at A-4.)

16

an interest."

iii.     (c) "The Seller and each Company have no Knowledge of or any basis to expect, nor have they, or any other Person for whose conduct they are or may be held responsible, received, any citation, directive, inquiry, notice, Order, summons, warning or other communication that relates to Hazardous Activity, Hazardous Materials, or any alleged, actual, or potential violation or failure to comply with or Liability under any Environmental Law, or of any alleged, actual, or potential violation or failure to undertake or bear the cost of any Environmental, Health and Safety Liabilities including with respect to any Facility or property or asset (whether real, personal or mixed) in which any Company has or had an interest, or with respect to any property or facility to which Hazardous materials generated, manufactured, refined, transferred, imported, used, handled, or processed by any Company, the Business or any other Person for whose conduct they are or may be held responsible, have been transported, treated, stored, handled, transferred, disposed, recycled or received."

iv.     (d) "None of the Companies nor any other Person for whose conduct it is or may be held responsible has any Environmental, Health and Safety Liabilities including with respect to the Business, the Assets used in or for the Business, any Facility or any other property or asset (whether real, personal, or mixed) in which any Company has or had an interest or any property geologically or hydrologically adjoining any Facility or any other property or asset." (PEI Ex. 1 at § 6.22.)

## Factual Findings

k.     PEI issued the following checks to NJDEP:

i.     On April 30, 2007, PEI issued a check for $6,692.25 to the Treasurer of the State of New Jersey. (PEI Ex. 9.) Although Kopenhaver testified that this check was for the payment of compliance monitoring fees, no bill or underlying documentation was introduced to explain when the fee was incurred, and no testimony was presented as to the exact nature of the fee.

ii.     On April 30, 2007, a check for $4,326.00 was issued to the Treasurer of the State of New Jersey. (PEI Ex. 9.)

Kopenhaver testified that the check was written for compliance monitoring fees, but no bill or other form of corroboration was produced to the Court, nor was any testimony provided regarding the exact nature of the charge.

iii. On April 30, 2007, a check for $21,318.00 was written to the Treasurer of the State of New Jersey.  (PEI Ex. 9.) Kopenhaver testified that the check was for "annual renewal fees" for the Call companies for the time period prior to acquisition.  No documentation was produced to support this conclusory testimony.

iv. On April 30, 2007, a check was written for $4,724.00 to the Treasurer of the State of New Jersey.  (PEI Ex. 9.) According to Kopenhaver, the check was allegedly for annual renewal fees for MART.  No bills were produced to support the testimony of Kopenhaver.  In addition, an accounts payable listing for MART produced by Call to PEI under section 11.1(a) of the SPA lists, a listing for the exact same amount, $4,724.00, is indicated as owing to the Treasurer of the State of New Jersey, and consequently disclosed to PEI. (See Call Ex. 67 at 2615.)

l. Kopenhaver testified that the fees were accrued prior to acquisition by the Call Companies, but were paid by PEI subsequent to the Closing Date. We cannot accept the free-standing testimony of Kopenhaver as to the purpose of these checks.  As we said earlier, we find him to be manipulative, self-interested, and undeserving of our trust. His truths are false truths.  Indeed, given the ease with which Plaintiff could have produced the underlying documentation, we find its absence to be significant.

m. PEI, through Kopenhaver, consulted with Stradley Ronon regarding the payment of the above fees to NJDEP, in an effort to determine which of the fees should be the responsibility of the Sellers.  Stradley Ronon's response characterized the fees as compliance monitoring fees and annual renewal fees and reached the conclusion that the fees were the responsibility of the Defendant.  (See PEI Ex. 6.)  Stradley Ronon's basis for concluding that these fees should properly be characterized as compliance monitoring and annual renewal fees is unknown.  Nor does any other basis for characterizing the fees in this manner  appear in the record.  Thus, the Stradley Ronon letter characterizing the costs as compliance monitoring and annual fees is a hearsay assertion in conflict with  Fed. R. Evid. 801(c), which is also untrustworthy because it was

prepared in anticipation of litigation.

n.  We do not find Kopenhaver's testimony, standing alone, to provide a
    sufficient basis for us to conclude that the charges concern compliance
    monitoring and annual fees.  Nor do we find his testimony that the
    amounts listed in Schedule 11.1(a), which were disclosed to PEI prior to
    acquisition, corresponded to different types of fees.  Kopenhaver's bald
    assertion that the disclosed fees owing to the Treasurer of the State of New
    Jersey reflected fees for categories "related to other charges that the state
    of New Jersey would charge" (Trial Tr. vol. I, 95, November 14, 2011) is
    an unsupported assertion which we cannot accept as fact.  No evidence
    was produced to explain how Kopenhaver was able to reach this
    conclusion by looking at the accounts receivable produced by Call; we
    simply cannot credit Kopenhaver's testimony on this point.

o.  Nor do we find sufficient evidence to support Kopenhaver's
    characterization as to when the fees were incurred and debts satisfied by
    the fees.  To reiterate, we do not find Kopenhaver to be a trustworthy
    witness.  As a result, we cannot conclude that the fees were incurred by
    Call and undisclosed to the Buyers.

Conclusions

p.  We were not presented with any trustworthy evidence that the checks
    produced by Plaintiff represent payment of liabilities that were incurred by
    Defendant.  Accordingly, we cannot find that Section 6.2(b)(iv) has been
    breached.  There is no evidence that it was Call or the Call Companies that
    caused the buyer to become subject to a tax or a liability of any kind, as
    those terms are defined in the SPA.

q.  There has been no credible evidence that the checks produced represented
    payments of liabilities that Call or the Call Companies incurred and failed
    to record.  It has not been proven to our satisfaction that any error in the
    financial statements, if error existed, was the consequence of a failure to
    record this particular liability, in violation of section 6.4.

r.  Since it has not been established that the checks at issue represent payment
    of liabilities incurred by Call or the Call Companies, we cannot find a
    breach of Section 6.5.   We have not been presented with evidence, nor do
    we conclude,  that the books are records are not "complete and correct"
    and do not "represent actual, bona fide transactions and have been
    maintained in accordance with sound business practices, including the
    maintenance of an adequate system of internal controls."  (PEI Ex. 1 at §

19

6.5.)

s.      Plaintiff has failed to establish violations of §§6.13 (a),  6.13(f), 6.17(a) and 6.17(b).  We do not credit the unsupported assertions of Kopenhaver; Plaintiff's claim fails with the failure to present independent documentary evidence in support of this contention.

t.      Plaintiff has failed to establish a violation of §6.22.  As discussed earlier, we do not accept Kopenhaver's unsupported assertions as true. Since PEI has failed to produce credible evidence establishing the actual nature of the debt satisfied by these checks, we do not find violations of Governmental Authorizations or pending or threatened proceedings to limit or revoke Government Authorizations within the meaning of the contract. Accordingly, we do not find that the Companies had received any notice of any claim of default, with respect to any such Governmental Authorization or of any notice of any other claim or Proceeding (or threatened Proceeding) relating to any such Governmental Authorization. Consequently, we cannot conclude that the costs paid to the NJDEP were necessary in order for the Companies to continue to be authorized to operate despite the change in ownership. (PEI Ex. 1 at § 6.22.)

u.      We do not have credible evidence before us establishing any portion of the $66,561 in fees paid to the NJDEP as attributable to an actual or threatened failure to comply with any environmental law provision. (See PEI Ex. 1 at § 6.22.)

v.      No credible evidence was produced of any "pending or threatened claims, Encumbrances, or other restrictions of any nature resulting from any Environmental, Health and Safety Liabilities or arising under or pursuant to any Environmental Law including with respect to or affecting any Company, the Business, the Assets used in or for the Business, or any Facility or other property or asset (whether real, personal or mixed) in which the Company has or had an interest" in violation of Section 6.22(b).(PEI Ex. 1 at § 6.22.)

w.      PEI produced no evidence that Seller suspected, had reason to suspect, or had received, "any citation, directive, inquiry, notice, Order, summons, warning or other communication that relates to Hazardous Activity, Hazardous Materials, or any alleged, actual, or potential violation or failure to comply with or Liability under any Environmental Law, or of any alleged, actual, or potential violation or failure to undertake or bear the cost of any Environmental, Health and Safety Liabilities including with respect to any Facility or property or asset (whether real, personal or

20

mixed) in which any Company has or had an interest, or with respect to any property or facility to which Hazardous materials generated, manufactured, refined, transferred, imported, used, handled, or processed by any Company, the Business or any other Person for whose conduct they are or may be held responsible, have been transported, treated, stored, handled, transferred, disposed, recycled or received." (PEI Ex. 1 at § 6.22.)

x.      No credible evidence was produced that either Call or the companies "ha[d] any Environmental, Health and Safety Liabilities including with respect to the Business, the Assets used in or for the Business, any Facility or any other property or asset (whether real, personal, or mixed) in which any Company has or had an interest or any property geologically or hydrologically adjoining any Facility or any other property or asset." (PEI Ex. 1 at § 6.22.)

*4c.*      *Drinker Biddle Legal Fees*

Plaintiff's Claim

a.      PEI alleges that Call incurred $80,000 in legal fees paid to Drinker Biddle in alleged breach of sections 6.4, 6.5, 6.8(a), and 6.12 of the SPA.

Contractual Provisions

b.      Under Section 6.4 of the SPA, the Sellers were required to provide financial statements that "fairly and accurately present the financial condition and the results of operations, changes in shareholders' equity and cash flows of the Companies as and at the respective dates of and for the period referred to in such Financial Statements, all in accordance with GAAP." (See PEI Ex. 1 at § 6.4.)

c.      Section 6.5 of SPA requires that the books of account and other financial records of the Companies are "complete and correct and represent actual, bona fide transactions and have been maintained in accordance with sound business practices, including the maintenance of an adequate system of internal controls." (See PEI Ex. 1 at § 6.5.)

d.      Under Subsection 6.8 of the SPA, the Sellers warranted that, "(a) The Companies own good and marketable title to all of the Assets free and clear of Encumbrances other than Permitted Encumbrances and those described in Schedule 6.8(a). The consummation of the transactions contemplated hereby shall not render Buyer liable in any manner for any debt, liability, tax or obligation of the Companies, known or unknown,

21

fixed or contingent, except for the Liabilities identified on Schedule 6.8(a) to this Agreement (all of which are reflected in the most recent Financial Statements of the Companies)."   (See PEI Ex. 1 at § 6.8.)

e.        Section 6.12 of the SPA provides that, "The Companies have no Liability except for Liabilities reflected or reserved against in the Financial Statements at December 31, 2005, all of which are accurately reflected on the Companies' books and records." (See PEI Ex. 1 at § 6.12.)

### Factual Findings

f.        PEI paid $80,000 in legal fees to Drinker, Biddle & Reath, LLP on January 31, 2008. (See PEI Ex. 13.)

g.        The subject litigation took place before the Closing Date, but no evidence was produced as to the exact date of the litigation.

h.        Drinker Biddle represented both Gregory Call and the Call Companies in litigation against Brian Horne, a minority stockholder in the Companies.

i.        The Companies were "shut down" as a result of the actions of Brian Horne.

j.        Conflicting testimony was presented regarding the nature of the lawsuit. Alsentzer and Kopenhaver testified that the case involved a shareholder litigation suit against Brian Horne, a minority shareholder in the Call Companies, and concerned Horne's rights with respect to the purchase of the Companies.

k.        Call testified that the shareholder dispute was only a portion of the litigation.  The remainder of the action pertained to a pricing dispute and a dispute regarding the shut down of the facilities, which concerned the rights of the Companies rather than Gregory Call personally.

l.        Neither party produced  documents or any other independent form of clarification as the precise nature of the lawsuit.  Neither side persuaded this Court of the truth of their assertions on this point.

### Conclusions

m.        Because Avena shredded certain books and records of the Companies for the period prior to the acquisition, PEI was not able to produce a full set of financial statements for the period immediately prior to the closing.  We

do not fault PEI for this inability, however the absence of these records leaves resolution of this claim dependent upon our determination of the credibility of the PEI principals.  Unfortunately, they were deceptive on important matters and we cannot accept their testimony as an act of faith. Corroboration is required.  Absent these books and records, we do not have intellectual comfort that Avena excluded the $80,000 legal fee claim. Accordingly, we cannot find a breach of section 6.4.

n.   Since the books and records for the years prior to the acquisition were not available, and these books and records alone would allow us to determine whether the $80,000 of legal fees were identified as liabilities, we cannot conclude that a violation of 6.5 took place.

o.   Although PEI produced Schedule 6.8 to the Court, the schedule refers to a chart that appears to be a part of the schedule, but is not in evidence. Thus, it does not appear that Schedule 6.8 in its entirety was produced to the Court.  As a result, the Court cannot determine a violation of section 6.8 of the SPA occurred.

p.   The December 31, 2005 Financial Statements referenced in Section 6.12 of the SPA have not been introduced into evidence.  Consequently, the Court cannot conclude that the values reflected in those statements does not include the $80,000.

q.   In sum, Plaintiff's claims on this issue rest principally upon the unsupported contentions of its witnesses.  Given our clear and firm adverse credibility findings with the PEI principals, we find that plaintiffs failed to satisfy their burden of persuasion.

4d.   *Legal Fees for Seller's NJDEP Consents*

<u>Plaintiff's Claim</u>

a.   Buyer claims that Seller is liable for incurring $30,928 in professional expenses for legal work performed in connection with the seller's alleged obligations to obtain approval from NJDEP for the sale of the companies to Pure Earth, which it claims violates Sections 6.4, 6.5, 6.8 (a), 6.12, 6.17(b), and 8.4 of the SPA.

<u>Contractual Provisions</u>

b.   Under Section 6.4 of the SPA, the Sellers were required to provide financial statements that "fairly and accurately present the financial

23

condition and the results of operations, changes in shareholders' equity and cash flows of the Companies as and at the respective dates of and for the period referred to in such Financial Statements, all in accordance with GAAP." (<u>See</u> PEI Ex. 1 at § 6.4.)

c.     Section 6.5 of SPA requires that the books of account and other financial records of the Companies are "complete and correct and represent actual, bona fide transactions and have been maintained in accordance with sound business practices, including the maintenance of an adequate system of internal controls." (<u>See</u> PEI Ex. 1 at § 6.5.)

d.     Under Subsection 6.8 of the SPA, the Sellers warranted that, "(a) The Companies own good and marketable title to all of the Assets free and clear of Encumbrances other than Permitted Encumbrances and those described in Schedule 6.8(a).  The consummation of the transactions contemplated hereby shall not render Buyer liable in any manner for any debt, liability, tax or obligation of the Companies, known or unknown, fixed or contingent, except for the Liabilities identified on Schedule 6.8(a) to this Agreement (all of which are reflected in the most recent Financial Statements of the Companies)." (<u>See</u> PEI Ex. 1 at § 6.8.)

e.     Section 6.12 of the SPA provides that, "The Companies have no Liability except for Liabilities reflected or reserved against in the Financial Statements at December 31, 2005, all of which are accurately reflected on the Companies' books and records." (<u>See</u> PEI Ex. 1 at § 6.12.)

f.     Section 8.4 of the SPA provides that, "Seller shall obtain, at its expense, any and all consents and approvals necessary for the effective transfer and conveyance to Buyer of the Stock, including, without limitation, the New Jersey Industrial Site Recovery Act ("ISRA").  All such consents and approvals shall be in writing and executed counterparts shall be delivered promptly to Buyer.  Notwithstanding the foregoing, Buyer shall be responsible for all costs associated with any consents and approvals required directly of Buyer by any Governmental Body, including but not limited to those approvals required pursuant to any Environmental Laws. The Companies and Seller shall not agree to any modification of any Company Contract in the course of obtaining any consents." (<u>See</u> PEI Ex. 1 at § 8.4.)

Factual Findings

g.     As support for this claim, PEI presented the testimony of Kopenhaver, who testified only that Pure Earth paid to obtain consents that Kopenhaver believed were the responsibility of the Seller under the SPA.  Kopenhaver

24

        did not explain why he believed that these consents were the responsibility of the Sellers.  Again, we cannot blindly accept the assertions of Kopenhaver.

h.          A check was issued to Stradley Ronon Stevens and Young, LLP for $30,927.50 on January 31, 2008.

i.          An invoice from Stradley Ronon Stevens and Young, LLP, reflects the cost of the obtaining the consents, which total $30,927.50.  The invoice characterizes the fees owed by PEI as those "properly chargeable to Greg Call."  (See PEI Ex. 14.)   This Court cannot accept this characterization by counsel for the plaintiff.

Conclusions

j.          PEI did not produce persuasive testimony or documentary evidence supporting its claim that costs were incurred in an effort to procure consents properly characterized as a liability of the Companies at the time of Closing.  Although evidence was produced as to the time period in which Stradley Ronon rendered its services as to the "consents," the record is silent as to the time period covered by the consents.

k.          Since it has not been established that the consents represented existing liabilities, we cannot find a breach of Section 6.4 of the SPA.  Moreover, the unaudited financial statements described in Section 6.4 have not been introduced into evidence. (See PEI Ex. 1 at § 6.4.)  As a result, we cannot determine to our satisfaction Avena's actions with regard to the claimed $30,927 liability.

l.          As a result of its inability to provide the underlying books and records, PEI has not established a violation of Section 6.5 of SPA.  Again, we are highly suspicious of the oral testimony provided before us.

m.          First, although Schedule 6.8 has been provided to this Court, it is incomplete.  Moreover, given that no billing or description of the "consents" described in this claim has been produced to the Court, it has not been established to our satisfaction that these consents represent an encumbrance on any assets owned by the former Call Companies or the Call Companies themselves.  Finally, we have not received any persuasive evidence that the consents represented a debt, liability, tax or obligation of the Companies in existence prior to PEI's acquisition of the Companies. (See PEI Ex. 1 at § 6.8.)

25

n.          We have no credible evidence before us tending to establish that the consents represented a liability of the Companies that should have been reflected in the Financial Statements produced in December 2005 to PEI. (See PEI Ex. 1 at § 6.12.)

o.          We cannot find a violation of Section 8.4 of the SPA. Given that 8.4 divides the responsibility for consents, distributing responsibility for certain consents to the Seller and distributing financial responsibility for other consents to the Buyer, the Court has not been provided with sufficient evidence of the character of the consents to determine whether, pursuant to the terms of the contract, they are the responsibility of the Buyer or the Seller. Plaintiff's documentary support for this claim is lacking, and the oral testimony offered in support of this claim does not meet our standards of credibility.

p.          Accordingly, we cannot conclude at this time that the consents obtained by Stradley Ronon were consents that were the responsibility of the Seller.

4e.    *Undisclosed Liabilities*

Plaintiff's Claim

a.          PEI claims that the Seller breached the SPA by failing to disclose $300,013 in existing liabilities which were not recorded on the closing balance sheet, in violation of sections 6.4, 6.5, 6.8(a) and 6.12 of the SPA.

Contractual Provisions

b.          Under Section 6.4 of the SPA, the Sellers were required to provide financial statements that "fairly and accurately present the financial condition and the results of operations, changes in shareholders' equity and cash flows of the Companies as and at the respective dates of and for the period referred to in such Financial Statements, all in accordance with GAAP." (See PEI Ex. 1 at § 6.4.)

c.          Section 6.5 of SPA requires that the books of account and other financial records of the Companies are "complete and correct and represent actual, bona fide transactions and have been maintained in accordance with sound business practices, including the maintenance of an adequate system of internal controls." (See PEI Ex. 1 at § 6.5.)

d.          Under Subsection 6.8 of the SPA, the Sellers warranted that, "(a) The Companies own good and marketable title to all of the Assets free and

clear of Encumbrances other than Permitted Encumbrances and those described in Schedule 6.8(a).  The consummation of the transactions contemplated hereby shall not render Buyer liable in any manner for any debt, liability, tax or obligation of the Companies, known or unknown, fixed or contingent, except for the Liabilities identified on Schedule 6.8(a) to this Agreement (all of which are reflected in the most recent Financial Statements of the Companies)."  (See PEI Ex. 1 at § 6.8.)

e.       Section 6.12 of the SPA provides that, "The Companies have no Liability except for Liabilities reflected or reserved against in the Financial Statements at December 31, 2005, all of which are accurately reflected on the Companies' books and records." (See PEI Ex. 1 at § 6.12.)

Factual Findings

f.       PEI utilized Anthony Creamer, CPA, in order to calculate the total value of undisclosed liabilities.  Creamer's detailing of these undisclosed liabilities categorized the liabilities into two categories, the first of which included (1) undisclosed liabilities that were either invoiced prior to the Closing Date but were not recorded in the books of the Companies or (2) were invoiced or quantified after the closing but relate to transactions, issues or agreements that took place before the closing, and the second of which included invoices from Edward Avena, who provided accounting services for the Companies prior to the sale of the Companies.  (See PEI Ex. 83 at 2-3.)

g.       To compile his report, Creamer reviewed invoices in an effort to calculate PEI's undisclosed liabilities.  Creamer relied on the invoices in order to discern the nature of the work and the date of the performance of the work.  Creamer's team then verified that payments were made by PEI for the amounts calculated.  In the course of his report, Creamer notes that he looked at invoices to determine whether the work underlying the invoice was "relate[d] to transactions, issues or agreements that took place before the closing."  (See PEI Ex. 83 at 2.)  From this assertion, it is apparent that PEI operated under an accrual method of accounting, and brought the Call Companies into compliance with this accounting method.  This was consistent with the requirement that all financial statements be in accordance with GAAP.

h.       As to the first category of expenses, our independent review of the invoices leads us to the conclusion that the amount calculated as to undisclosed liabilities is accurate, except for Reference Number ACR1007-2  ($7,150.00) and Reference Number 506 ($1000.00).  There is

27

no evidence that these expenses accrued before closing.

i.      Our review of the invoices and exhibits establishes $100,000 as the actual amount Pure Earth paid to reach settlement with the Coalition for Clean Air and Water.

j.      As to the second category of expenses, the Ed Avena invoices, Plaintiff has established that the transactions identified as Reference Number 038556 for $2,462.50, Reference Number 042562 for $787.50, Reference Number 003066 for $2,925.00, concern undisclosed liabilities. Insufficient evidence has been presented to allow us to conclude that the remaining expenses accrued prior to closing.  Thus, Call failed to disclose $6,175.00 in outstanding Ed Avena invoices.

<u>Conclusions</u>

k.      Section 6.5 of SPA requires that the books of account and other financial records of the Companies are "complete and correct and represent actual, bona fide transactions and have been maintained in accordance with sound business practices, including the maintenance of an adequate system of internal controls." (<u>See</u> PEI Ex. 1 at § 6.5.)   We find that Section 6.5 has been breached.

**l.**      Undisclosed liabilities total $219,788, not $300, 013 as claimed by Plaintiff.   Plaintiff claims that the total costs for the first category of expenses is $221,763.30, and that the total costs for the second category of expenses was $78,250.00.  The sum total of these expenses is claimed to be $300,013.30.  As noted above, the first category of expenses for $221,763.30 must be reduced by $8,150.00, thus totaling 213,613.30.  The second category of expenses, also discussed above, which accounts for the billing of Ed Avena, cannot be collected at all, except for $6,175.00.  Thus, the sum total that Call is liable for is 219,788.30.

4f.     *Health Insurance Opt Out Payments*

<u>Plaintiff's Claim</u>

a.      Buyer claims that Seller is liable for $104,901 incurred as a result of payments to employees for waiver of medical insurance coverage that were allegedly not disclosed on the Closing Date, in violation of sections 6.4, 6.5, 6.12, and 6.15 of the SPA.

<u>Contractual Provisions</u>

b.  Under Section 6.4 of the SPA, the Sellers were required to provide financial statements that "fairly and accurately present the financial condition and the results of operations, changes in shareholders' equity and cash flows of the Companies as and at the respective dates of and for the period referred to in such Financial Statements, all in accordance with GAAP."  (See PEI Ex. 1 at § 6.4.)

c.  Section 6.5 of SPA requires that the books of account and other financial records of the Companies are "complete and correct and represent actual, bona fide transactions and have been maintained in accordance with sound business practices, including the maintenance of an adequate system of internal controls." (See PEI Ex. 1 at § 6.5.)

d.  Section 6.12 of the SPA provides that, "The Companies have no Liability except for Liabilities reflected or reserved against in the Financial Statements at December 31, 2005, all of which are accurately reflected on the Companies' books and records."  (See PEI Ex. 1 at § 6.4.)

e.  Section 6.15 provides, in relevant part:

i.  "(a) Schedule 6.15 contains a complete and accurate list of the following information for each employee of the Company, including each employee on leave of absence or layoff status: name; job title; date of commencement of employment or engagement; current compensation paid or payable and any change in compensation since December 31, 2005; sick leave, vacation leave and all other paid leave that is accrued but unused.. . . ."

ii.  "(c) A complete and accurate list of each Company's Employee Benefit Plans are set forth in Schedule 6.15(c). No Company has maintained, contributed to, or had an obligation to contribute to any other Employee Benefit Plan within the past five (5) years other than those set forth on Schedule 6.15(c).  No Company has proposed any new Employee Benefit Plans nor has it proposed any amendments or modifications to its current Employee Benefit Plans.  Each Company's Employee Benefit Plans have been operated and administered in all material respects in accordance with their provisions and applicable Legal Requirements, including but not limited to ERISA and the Code and each of the Employee Benefit Plans which is an "employee pension benefit plan" within the meaning of Section 3(2) of ERISA and which is intended to

be "qualified" under Section 401(a) of the Code is so qualified.  There are no pending or threatened or anticipated claims, audits, or investigations (other than routine claims for benefits) by, on behalf of, relating to or against any of the Employee Benefit Plans or any trusts related thereto. None of the Companies nor any ERISA Affiliate maintains or has any liability under any Employee Benefit Plan subject to Title IV of ERISA or Section 412 of the Code."

iii.	"(d) Except as set forth on Schedule 6.15(d), Buyer shall have no responsibility for any obligations under Section 4980B of the Code, or sections 601-609 of ERISA or any similar provisions for health care continuation coverage under applicable Legal Requirements with respect to the Companies' Employee Benefit Plans (collectively, "COBRA Obligations") resulting from the transactions contemplated hereby."

iv.	"(e) No liabilities exist or are reasonably expected to exist under any Employee Benefit Plan of any Company that, individually or in the aggregate, would have a material adverse effect on the Business, Assets, Liabilities, condition (financial or otherwise), results of operations or prospects of such Company."

v.	"(f) No Company has entered into any individual agreement or otherwise made any individual commitment to any employee with respect to continued benefits or employment by such Company or Buyer. . . ."

vi.	 "(j) With respect to the Companies' Employee Benefits Plans, the Companies have delivered to Buyer true and complete copies of : (i) any and all plan texts and agreements (including, but not limited to, trust agreements, insurance contracts and investment management agreements); (ii) any and all material employee communications (including relating to summary plan descriptions and material modifications thereto); (iii) the two most recent Forms 5500 filed with the IRS for each plan for which a Form 5500 was required to be filed with the IRS and any other form or filing required to be submitted to any Governmental Body with regard to any such Employee Benefit Plans; (iv) the most recent annual and periodic accounting of plan assets, if applicable; (v) the most recent determination letter received from the IRS, if applicable, and (vi) in the case of any unfunded or self-insured plan or arrangement, an estimate of accrued and

30

anticipated liabilities thereunder. . . ."  (See PEI Ex. 1 at § 6.15.)

Factual Findings

f.        Schedule 6.15 (c) accurately and completely sets forth the Employee Benefit Plans.

g.        Schedule 6.15 (d) contains a list of all employees at Casie, MART, and Rezultz, detailing their Employee ID Number, Employment Date, Hourly Rate, Position, Sick Time Used, Sick Time Accrued, and Sick Leave Remaining for 2007, along with the number of vacation days each employee possessed.

h.        A program existed at Casie, MART, and Rezultz in which hourly employees were paid a dollar per hour above the salary rate disclosed in Schedule 6.15(d) upon waiver of health insurance coverage.  Salaried personnel were offered a similar option, but for a fixed amount, rather than for a dollar per hour.

i.        The principals of PEI were not aware of the program at the time of the Closing Date.

j.        The program continued to operate into 2009.  Alsentzer testified that PEI, "probably should have caught it sooner, but we didn't."  (Trial Tr. vol. I, 167, November 14, 2011.)  We conclude that it was unreasonable for PEI to have not caught the continued operation of the program until 2009.

k.        Although Kopenhaver testified that employees did not select health insurance coverage once the opt-out program concluded, we find his explanation to be incomplete.  As Steve Martinez testified, "[T]hey terminated the program after the open enrollment period ended.  I know there was quite a few employees who were somewhat upset over this." (Trial Tr. vol. II, 201, November 15, 2011.)  We find Martinez's testimony to be truthful and accurate; indeed, Martinez was the most truthful of all former employees presented by PEI and the Companies.

l.        Kopenhaver conducted an analysis to determine the cost of the health insurance opt out initiative.  (PEI Ex. 20.)  Kopenhaver included credits to Call in those instances in which Kopenhaver concluded the opt-out program saved the Companies money overall.

m.        Kopenhaver's analysis covers the period from April 6, 2007 to February

31

13, 2009.  The Closing Date for the SPA was March 30, 2007.  (PEI Ex. 20.)

n.    Kopenhaver's analysis includes amounts for Gary Johnstone, Evan Jones, Paul Molnar, Gregory O'Connell, and Lois Vanderski that lists the amount of payment for opting out without listing the number of hours they worked.  (PEI Ex. 20.)  We conclude that these individuals were salaried employees, rather than hourly wage earners.

o.    The Kopenhaver analysis is grossly flawed in that it provides an inflated measure of savings to PEI.  The methodology utilized Plaintiff can never result in an accurate measure of actual savings since, at the time of measurement, the option of enrolling in a benefit plan was not available.  Enrollment, when measured immediately after termination of the opt-out program and at a point at which the opportunity for selecting health coverage is not present, will always be "zero" and savings consequently exaggerated.  A genuine measure of savings could only occur if, concurrent with the elimination of the opt-out program, employees were offered the option of enrolling in a health care plan.

We find the analysis tendered by Pure Earth deceptive and deliberately misleading.

p.    We have no credible, accurate or reliable evidence before us that would permit a valid measure of damages incurred as a result of the failure to disclose this program.

## Conclusions

q.    To the extent that the expense of the health insurance opt out program was not recorded in the Companies' financial statements, Call failed to "fairly and accurately present the financial condition and the results of operations, changes in shareholders' equity and cash flows of the Companies as and at the respective dates of and for the period referred to in such Financial Statements, all in accordance with GAAP." (See PEI Ex. 1 at § 6.4.)

r.    In that the compensation disclosed in Schedule 6.15 did not accurately disclose the compensation paid to employees, a breach of 6.15 has occurred.

s.    No trustworthy or accurate evidence of damages has been produced.  The Kopenhaver analysis projects an estimation of damages premised upon the assumption that the employees would have declined health insurance and

does not factor in the failure to provide an opportunity to select health care coverage.  As Martinez convinced this Court, this was a false measure of savings.  Accordingly, as we reject Kopenhaver's testimony, PEI has not presented an accurate measure of its damages.

4g.    *Gregory Call's Life Insurance Payments*

### Plaintiff's Claim

a.        Buyer claims that Seller is liable for $87,585 incurred due to the Companies' payment of personal life insurance coverage for Call and another individual in alleged breach of one or more of the covenants, representations, and warranties contained in sections 6.4, 6.5, 6.12, and 6.15 of the SPA.

### Contractual Provisions

b.        Under Section 6.4 of the SPA, the Sellers were required to provide financial statements that "fairly and accurately present the financial condition and the results of operations, changes in shareholders' equity and cash flows of the Companies as and at the respective dates of and for the period referred to in such Financial Statements, all in accordance with GAAP."  (PEI Ex. 1 at § 6.4.)

c.        Section 6.5 of SPA requires that the books of account and other financial records of the Companies are "complete and correct and represent actual, bona fide transactions and have been maintained in accordance with sound business practices, including the maintenance of an adequate system of internal controls." (PEI Ex. 1 at § 6.5.)

d.        Section 6.12 of the SPA provides that, "The Companies have no Liability except for Liabilities reflected or reserved against in the Financial Statements at December 31, 2005, all of which are accurately reflected on the Companies' books and records." (PEI Ex. 1 at § 6.12.)

e.        SPA 6.15 provides, in relevant part, as follows:
   i.            "(a) Schedule 6.15 contains a complete and accurate list of the following information for each employee of the Company, including each employee on leave of absence or layoff status: name; job title; date of commencement of employment or engagement; current compensation paid or payable and any change in compensation since December 31, 2005; sick leave, vacation leave and all other paid leave

33

that is accrued but unused.. . . ."

ii.      "(c) A complete and accurate list of each Company's Employee Benefit Plans are set forth in Schedule 6.15(c). No Company has maintained contributed to or had an obligation to contribute to any other Employee Benefit Plan within the past five (5) years other than those set forth on Schedule 6.15(c).  No Company has proposed any new Employee Benefit Plans nor has it proposed any amendments or modifications to its current Employee Benefit Plans.  Each Company's Employee Benefit Plans have been operated and administered in all material respects in accordance with their provisions and applicable Legal Requirements, including but not limited to ERISA and the Code and each of the Employee Benefit Plans which is an "employee pension benefit plan" within the meaning of Section 3(2) of ERISA and which is intended to be "qualified" under Section 401(a) of the Code is so qualified.  There are no pending or threatened or anticipated claims, audits, or investigations (other than routine claims for benefits) by, on behalf of, relating to or against any of the Employee Benefit Plans or any trusts related thereto. None of the Companies nor any ERISA Affiliate maintains or has any liability under any Employee Benefit Plan subject to Title IV of ERISA or Section 412 of the Code."

iii.      "(d) Except as set forth on Schedule 6.15(d), Buyer shall have no responsibility for any obligations under Section 4980B of the Code, or sections 601-609 of ERISA or any similar provisions for health care continuation coverage under applicable Legal Requirements with respect to the Companies' Employee Benefit Plans (collectively, "COBRA Obligations") resulting form the transactions contemplated hereby."

iv.      "(e) No liabilities exist or are reasonably expected to exist under any Employee Benefit Plan of any Company that, individually or in the aggregate, would have a material adverse effect on the Business, Assets, Liabilities, condition (financial or otherwise), results of operations or prospects of such Company."

v.      "(f) No Company has entered into any individual agreement or otherwise made any individual commitment to any employee with respect to continued benefits or employment by such Company or Buyer. . . ."

vi.      "(j) With respect to the Companies' Employee Benefits

34

Plans, the Companies have delivered to Buyer true and complete copies of : (i) any and all plan texts and agreements (including, but not limited to, trust agreements, insurance contracts and investment management agreements); (ii) any and all material employee communications (including relating to summary plan descriptions and material modifications thereto); (iii) the two most recent Forms 5500 filed with the IRS for each plan for which a Form 5500 was required to be filed with the IRS and any other form or filing required to be submitted to any Governmental Body with regard to any such Employee Benefit Plans; (iv) the most recent annual and periodic accounting of plan assets, if applicable; (v) the most recent determination letter received from the IRS, if applicable, and (vi) in the case of any unfunded or self-insured plan or arrangement, an estimate of accrued and anticipated liabilities thereunder. . . ." (See PEI Ex. 1 at § 6.15.)

### Factual Findings

f.      The life insurance policies originated as "key life insurance," kept for the owners of the Companies.

g.      At some time prior to the Closing Date, Kopenhaver instructed Call to terminate the policies as of "the date of the acquisition." (Trial Tr. vol. I, 45, November 14, 2011.)

h.      Although other life insurance policies were cancelled, Call failed to cancel policies providing coverage to himself and Mouser. (See PEI Exs. 26 and 27.) Curiously, Mouser approved Call's policy as an authorized corporate official and Call performed the reciprocal service for Mouser's insurance policies.

Call's testimony in this area was grossly deceptive.

i.      On September 13, 2007, Call executed a beneficiary designation form for the life insurance policy at least six months after he had been told to cancel the policy.

j.      Call testified that he did not know that the policies had not been cancelled, despite his personal execution of the designation forms in September of 2007.

35

This testimony was intentionally false.  Call knew that the policies had not been cancelled.

k.      The premium payments on the Mouser and Call policies continued until January of 2009.

l.      Call did not maintain his life insurance policy after January 2009.

Conclusions

m.      The Court cannot find a breach of 6.4, 6.5, or 6.12 because the unaudited financial statements and books and records provided to PEI have not been introduced into evidence, meaning that the Court cannot conclude that the cost of the policy was undisclosed to PEI in the financial records. Although the Fifth Amendment to the Stock Purchase agreement contains information regarding what was contained in Ed Avena's financial statements, and was introduced into evidence, without the underlying books and records, the Court cannot accurately assess whether this liability was excluded from calculations by Avena in making his determination of the overall liabilities of the Companies.

n.      A review of Schedule 6.15 reveals that the life insurance policy was not disclosed in the Schedule.

o.      Kopenhaver was aware of the existence of the insurance policy prior to the Closing Date, and asked Call to cancel the policy prior to the acquisition. (See Trial Tr. vol. I, 107, November 14, 2011.)

p.      Call breached Section 6.15(f) by making a commitment to continue benefits, and in completing the beneficiary designation form.  This breach resulted in damages to Plaintiff.

q.      Although Call pled failure to mitigate, Defendant did not meet his burden of presenting evidence in support of this affirmative defense.

         i.      Under Pennsylvania law, mitigation is an affirmative defense, for which the defense here bears the burden of proof.  See Prusky v. ReliaStar Life Ins.Co, 532 F.3d 252, 258 (3d Cir. 2008)(applying Pennsylvania state law). In order to prove a failure to mitigate damages, Defendant must show, "(1) what reasonable actions the plaintiff ought to have taken, (2) that those actions would have reduced

damages, and (3) the amount by which the damages would have been reduced." Id.  The evidence regarding failure to mitigate included that Kopenhaver controlled the financial operations of the Companies subsequent to acquisition (see Trial Tr. vol. I, 107-08, November 14, 2011.)  The implication of questioning by counsel was that, given that Kopenhaver controlled the financial operations of the Companies, he should have stopped payment on the checks. Kopenhaver admitted that he signed the checks for the Companies (id.), and controlled the operations.

ii.     Problematic, however, for the defendant is that Plaintiff cancelled payments on the policy at the time that Plaintiff discovered that the policy remained in effect.  In essence, Defendant's argument regarding failure to mitigate hinges on the idea that Defendant failed to mitigate because it failed to discover the payments earlier and cancel the policy.  However, no authority exists for the proposition that this constitutes a valid defense to a breach of contract. Moreover, authority to the contrary exists, which suggests that where a plaintiff does not discover a breach due to the actions or fraud of a defendant, the defendant cannot allege a failure to mitigate in order to reduce the amount of damages recoverable.  See, e.g., Security National Bank v. Recreational Dimensions, Inc., 191 Mass. App. Div. 21, at *2 (Mass. Dist. Ct. 1991).  Cf. Union Planters Bank, N.A. v. Continental Casualty Co., 478 F.3d 759, 765 (6th Cir. 2007).

iii.    Moreover, under the doctrine governing the failure to mitigate damages, "after the plaintiff has reason to know that a breach has occurred or that a breach is impending under circumstances such that it is not reasonable for the defendant to prevent harm, he is expected to take such steps to avoid harm as a prudent person would take. . . In general, however, it is reasonable for the plaintiff to rely upon the defendant to perform as he has promised.  Also, it may be reasonable for him to expect the defendant to take the steps necessary to prevent harm after a breach has occurred." Restatement (First) of  Contracts § 336 (1932).  Under this logic, once Kopenhaver learned of the policy, he asked Call to cancel the policy.  Under the circumstances, and given the relationship between the parties at the time, it was reasonable for Kopenhaver to believe that Call had canceled the policy as promised.  Subsequent to that point,

37

Kopenhaver had no reason to know that the policy had not been canceled, given that it was controlled by an automatic debit account, and further given that he believed that it had been canceled.  The payments were canceled once the existence of policy was discovered.  As a consequence, the plaintiff did not fail to mitigate their damages.

4h.     *Cumberland County Landfill*

Plaintiff's Claim

a.        Seller claims that Buyer should be liable for $2,014,354 incurred as a result of local authorities in Cumberland County, New Jersey, denying PEI the right to use a landfill located in Cumberland County in alleged violation of sections 6.17(a)-(b) and 6.22(a)-(g) of the SPA.

Contractual Provisions

b.        Section 6.17 (a) provides, "The operation of the Business, the conduct of the Business as and where such business has been conducted, the hiring, terminating, compensating and otherwise managing or dealing with the employees, and the ownership, possession, and use of the Assets used in or for the Business, comply and have complied with all Legal Requirements applicable to the Companies, their operations, the Business, the Assets and the Liabilities.  The Companies have obtained and hold all Governmental Authorizations required for the lawful operation of the Business as and where such business is presently conducted.  All Governmental Authorizations relating to the Business are identified on Schedule 6.7, and copies of such Governmental Authorizations have been delivered to Buyer."  (PEI Ex. 1 at § 6.17.)

c.        6.17(b) provides that "Except as set forth in Schedule 6.17, all such Governmental Authorizations are in full force and effect, no violations are or have been recorded in respect of any Governmental Authorization and no proceeding is pending or threatened to enforce, revoke, terminate or limit any Governmental Authorization.  Except as set forth in Schedule 6.17, no Company is in default, and has not received any notice of any claim of default, with respect to any such Governmental Authorization or of any notice of any other claim or Proceeding (or threatened Proceeding) relating to any such Governmental Authorization.  Except as set forth in Schedule 6.17, all such Governmental Authorizations shall survive a change in ownership of the Companies without the Consent of any Person and shall remain in full force and effect immediately following the

38

Closing."  (PEI Ex. 1 at § 6.17.)

d.          Section 6.22 provides that except as disclosed in Schedule 6.22,

        i.          "(a) Each Company, the Business and the Assets used in or for the Business are, and at all times have been, in full compliance with, and have not been and are not in violation of or liable under, any Environmental Law.  No Company has any basis to expect, nor has it or any other Person for whose conduct it is or may be held to be responsible received, any actual or threatened order, notice or other communication from (i) any Governmental body or private citizen acting in the public interest, (ii) the current or prior owner or operator of any Facilities, or (iii) any other Person, of any actual or potential violation or failure to comply with any Environmental Law, or of any actual or threatened obligation to undertake, bear the cost of or otherwise be responsible for any Environmental, Health, and Safety Liabilities including with respect to any Facility or other property or asset (whether real, personal, or mixed) in which any Company has or had an interest, or with respect to any property or Facility at or to which Hazardous Materials were generated, manufactured, refined..."

        ii.          "(b) There are no pending or threatened claims, Encumbrances, or other restrictions of any nature resulting from any Environmental, Health and Safety Liabilities or arising under or pursuant to any Environmental Law including with respect to or affecting any Company, the Business, the Assets used in or for the Business, or any Facility or other property or asset (whether real, personal or mixed) in which the Company has or had an interest."

        iii.          "(c) The Seller and each Company have no Knowledge of or any basis to expect, nor have they, or any other Person for whose conduct they are or may be held responsible, received, any citation, directive, inquiry, notice, Order, summons, warning or other communication that relates to Hazardous Activity, Hazardous Materials, or any alleged, actual, or potential violation or failure to comply with or Liability under any Environmental Law, or of any alleged, actual, or potential violation or failure to undertake or bear the cost of any Environmental, Health and Safety Liabilities including with respect to any Facility or property or asset (whether real, personal or mixed) in which any Company has or had an interest, or with respect to any property or

39

facility to which Hazardous materials generated, manufactured, refined, transferred, imported, used, handled, or processed by any Company, the Business or any other Person for whose conduct they are or may be held responsible, have been transported, treated, stored, handled, transferred, disposed, recycled or received."

iv.    "(d) None of the Companies nor any other Person for whose conduct it is or may be held responsible has any Environmental, Health and Safety Liabilities including with respect to the Business, the Assets used in or for the Business, any Facility or any other property or asset (whether real, personal, or mixed) in which any Company has or had an interest or any property geologically or hydrologically adjoining any Facility or any other property or asset."

v.    "(e) There are and have been no Hazardous Materials present on or in the indoor or outdoor Environment at or from any Facility or at any geologically or hydrologically adjoining property, including any Hazardous Materials contained in barrels, aboveground or underground storage tanks, landfills, land deposits, dumps, equipment (whether movable or fixed) or other containers, either temporary or permanent, and deposited or located in land, water, sumps, or any other part of the Facility or such adjoining property, or incorporated into any structure therein or thereon except in full compliance with all applicable Environmental Laws. None of the Companies nor any Person for whose conduct it is or may be held responsible, or any other Person, has permitted or conducted, or is aware of, any Hazardous Activity conducted with respect to any Facility, the Business, the Assets used in or for the Business or any other property or assets (whether real, personal, or mixed) in which any Company has or had an interest except in full compliance with al applicable Environmental Laws."

vi.    "(f) There has been no Release or Threat of Release of any Hazardous Materials at or from any Facility or at any other location, including any off-site disposal location, where any Hazardous Materials were generated, manufactured, refined, transferred, produced, imported, used, handled or processed from or by any Facility, or from any other property or asset (whether real, personal, or mixed) in which any company has or had any interest, or any geologically or hydrologically adjoining property, whether

by any Company or any other Person."

vii.      "(g) Each company has delivered to Buyer true and complete copies and results of any permits, licenses, correspondence, notices and documents, including any reports, studies, analyses, tests, or monitoring possessed, controlled or initiated by such Company pertaining to Hazardous Activity in, on, or under or from the Facilities, or concerning compliance by the Business, the Assets used in or for the Business or such Company or any other Person for whose conduct it is or may be held responsible, with Environmental Laws." (PEI Ex. 1 at § 6.22.)

### Factual Findings

e.      The Cumberland County landfill is the landfill that is the closest to the facilities. The Cumberland County landfill was used by the Call Companies to dispose of soil until the acquisition, and was used by PEI to dispose of soils until May 2007.

f.      In May 2007, subsequent to PEI's acquisition of the Companies, PEI was prohibited from transporting materials to the Cumberland County landfill.

g.      In order to secure an alternative location in which to dispose of waste materials, PEI executed a two-year contract with the Gloucester County landfill in August of 2007.

h.      The acceptance criteria for each county's landfill was different. The acceptance or rejection of waste materials was highly arbitrary, rather than the consequence of clear standards. (Trial Tr. vol. I, 112-114, November 14, 2011.)

i.      The soil sought to be disposed of in Cumberland County satisfied state standards. (Trial Tr. vol. I, 115, November 14, 2011.)

j.      The Companies did not fail to comply with any legal obligations, and no violations were recorded in respect of Cumberland County.

k.      No communications were received from Cumberland County prior to the Closing Date indicating that the Companies were likely to lose their ability to use the landfill.

l.      Cumberland County had not threatened or restricted use of the landfill prior to the Closing Date.

m.      Call had no knowledge of any violation or any other reason to believe that usage of the Cumberland County landfill would be restricted.

n.      In fact, the change which created the concern of the Cumberland County inspector was made by PEI after it had acquired the Companies. A newly hired PEI employee, Phil Guenzer, altered storage procedures such that non-thermitic materials were being warehoused in Area 6, despite the fact that the Companies had not yet acquired a permit to allow for the storage of non-thermitic materials in this area. (Trial Tr. vol. II, 202-204, November 15, 2011.) The Cumberland County inspector saw this improper storage, which lead to Cumberland County's refusal to accept waste from the Companies. (See id.)

        Martinez accurately stated the reasons that Cumberland County refused to accept the waste materials.

o.      No facts about the Cumberland County landfill were omitted by Call regarding the Cumberland County landfill.

<u>Conclusions</u>

p.      No breaches of any warranties occurred with respect to the Cumberland County landfill.

q.      At the time that Call owned the Companies, the Companies complied with all legal requirements applicable to waste disposal at the Cumberland County landfill. The Companies had obtained and held all Governmental Authorizations required in order to dispose of waste at the facility. PEI failed to identify any governmental authorizations required in documentary form in order to utilize the Cumberland County landfill that were required to be produced in Schedule 6.7. (See PEI Ex. 1 at § 6.7.)

r.      PEI did not produce evidence of any violations that had been recorded against the Call Companies with respect to the Cumberland County landfill. PEI did not identify any proceedings pending against the Call Companies with respect to use of the landfill that were not reported to PEI. PEI did not produce any evidence of a default with respect to the Cumberland County landfill. No evidence was produced that Cumberland County's refusal to allow the Companies to use the landfill subsequent to the acquisition dealt with the change in ownership. (PEI Ex. 1 at § 6.17.)

s.      PEI did not produce any evidence that an environmental violation caused

the Companies to lose their authorization to use the landfill.  PEI did not produce evidence that Call or the Call Companies should have expected to lose authorization to use the landfill. (PEI Ex. 1 at § 6.22(a).)

t.      No evidence was produced that Cumberland County had threatened to terminate or restrict access to the landfill as the result of any Environmental, Health, or Safety Liabilities before the acquisition. (PEI Ex. 1 at § 6.22(b).)

u.      No credible evidence was produced that the seller or the Companies had knowledge of, or any basis to expect any restrictive action on the part of the Cumberland County landfill, nor did they receive notice of any such action. (PEI Ex. 1 at § 6.22(c).)

v.      No evidence was produced that Call or the Call Companies had any Environmental, Health and Safety Liabilities relating to the Cumberland County landfill.(PEI Ex. 1 at § 6.22(d).)

w.      Although evidence was produced regarding the storing of materials after the acquisition, no evidence was produced that hazardous materials were stored in violation of applicable environmental laws while Call retained ownership of the Companies.  In fact, we find that PEI created the new policies that lead to the violation of applicable environmental laws. (PEI Ex. 1 at § 6.22 (e).)

x.      No evidence was presented or produced regarding the release or threat of release of any hazardous materials form the facilities during the time of Call's ownership, which might have caused Cumberland County to refuse to accept waste. (PEI Ex. 1 at § 6.22 (f).)

y.      PEI did not produce any credible evidence that Cumberland County's refusal to accept waste was the result of Call's failure to produce copies of all permits, licenses, or other documentation. (PEI Ex. 1 at § 6.22(g).)

z.      To the contrary, Cumberland County's refusal to accept PEI waste materials was the direct consequence of changes made by PEI after it had acquired the Companies.  PEI's testimony on this claim was intentionally misleading.

Plaintiff's request for $2,014,354 under these circumstances is shamefully deceptive and is denied.

4i.      *EPA Litigation*

Plaintiff's Claim

a.        PEI requests declaratory relief that it is entitled to an award commensurate with the EPA fine imposed as a result of the Companies' alleged failure to properly process hazardous waste, properly test oil recovered from hazardous waste, commingling of hazardous waste recovered oil with non-hazardous waste recovered oil, shipping of hazardous waste into the stream of commerce without proper manifests and shipping papers, and other related violations, alleged to be violations of sections 6.17(a)-(b), 6.22(a)-(g), and 6.18 of the SPA.

Contractual Provisions

b.        Section 6.17 (a) provides, "The operation of the Business, the conduct of the Business as and where such business has been conducted, the hiring, terminating, compensating and otherwise managing or dealing with the employees, and the ownership, possession, and use of the Assets used in or for the Business, comply and have complied with all Legal Requirements applicable to the Companies, their operations, the Business, the Assets and the Liabilities.  The Companies have obtained and hold all Governmental Authorizations required for the lawful operation of the Business as and where such business is presently conducted.  All Governmental Authorizations relating to the Business are identified on Schedule 6.7, and copies of such Governmental Authorizations have been delivered to Buyer.  (PEI Ex. 1 at § 6.17.)

c.        6.17(b) provides that "Except as set forth in Schedule 6.17, all such Governmental Authorizations are in full force and effect, no violations are or have been recorded in respect of any Governmental Authorization and no proceeding is pending or threatened to enforce, revoke, terminate or limit any Governmental Authorization.  Except as set forth in Schedule 6.17, no Company is in default, and has not received any notice of any claim of default, with respect to any such Governmental Authorization or of any notice of any other claim or Proceeding (or threatened Proceeding) relating to any such Governmental Authorization.  Except as set forth in Schedule 6.17, all such Governmental Authorizations shall survive a change in ownership of the Companies without the Consent of any Person and shall remain in full force and effect immediately following the Closing."(PEI Ex. 1 at § 6.17.)

d.        Section 6.22 provides that except as disclosed in Schedule 6.22,

44

i.        "(a) Each Company, the Business and the Assets used in or for the Business are, and at all times have been, in full compliance with, and have not been and are not in violation of or liable under, any Environmental Law.  No Company has any basis to expect, nor has it or any other Person for whose conduct it is or may be held to be responsible received, any actual or threatened order, notice or other communication from (i) any Governmental body or private citizen acting in the public interest, (ii) the current or prior owner or operator of any Facilities, or (iii) any other Person, of any actual or potential violation or failure to comply with any Environmental Law, or of any actual or threatened obligation to undertake, bear the cost of or otherwise be responsible for any Environmental, Health, and Safety Liabilities including with respect to any Facility or other property or asset (whether real, personal, or mixed) in which any Company has or had an interest, or with respect to any property or Facility at or to which Hazardous Materials were generated, manufactured, refined..."

ii.        "(b) There are no pending or threatened claims, Encumbrances, or other restrictions of any nature resulting from any Environmental, Health and Safety Liabilities or arising under or pursuant to any Environmental Law including with respect to or affecting any Company, the Business, the Assets used in or for the Business, or any Facility or other property or asset (whether real, personal or mixed) in which the Company has or had an interest."

iii.        "(c) The Seller and each Company have no Knowledge of or any basis to expect, nor have they, or any other Person for whose conduct they are or may be held responsible, received, any citation, directive, inquiry, notice, Order, summons, warning or other communication that relates to Hazardous Activity, Hazardous Materials, or any alleged, actual, or potential violation or failure to comply with or Liability under any Environmental Law, or of any alleged, actual, or potential violation or failure to undertake or bear the cost of any Environmental, Health and Safety Liabilities including with respect to any Facility or property or asset (whether real, personal or mixed) in which any Company has or had an interest, or with respect to any property or facility to which Hazardous materials generated, manufactured, refined, transferred, imported, used, handled, or processed by any Company, the Business or any other

45

Person for whose conduct they are or may be held responsible, have been transported, treated, stored, handled, transferred, disposed, recycled or received."

iv.     "(d) None of the Companies nor any other Person for whose conduct it is or may be held responsible has any Environmental, Health and Safety Liabilities including with respect to the Business, the Assets used in or for the Business, any Facility or any other property or asset (whether real, personal, or mixed) in which any Company has or had an interest or any property geologically or hydrologically adjoining any Facility or any other property or asset."

v.     "(e) There are and have been no Hazardous Materials present on or in the indoor or outdoor Environment at or from any Facility or at any geologically or hydrologically adjoining property, including any Hazardous Materials contained in barrels, aboveground or underground storage tanks, landfills, land deposits, dumps, equipment (whether movable or fixed) or other containers, either temporary or permanent, and deposited or located in land, water, dumps, or any other part of the Facility or such adjoining property, or incorporated into any structure therein or thereon except in full compliance with all applicable Environmental Laws. None of the Companies nor any Person for whose conduct it is or may be held responsible, or any other Person, has permitted or conducted, or is aware of, any Hazardous Activity conducted with respect to any Facility, the Business, the Assets used in or for the Business or any other property or assets (whether real, personal, or mixed) in which any Company has or had an interest except in full compliance with all applicable Environmental Laws."

vi.     "(f) There has been no Release or Threat of Release of any Hazardous Materials at or from any Facility or at any other location, including any off-site disposal location, where any Hazardous Materials were generated, manufactured, refined, transferred, produced, imported, used, handled or processed from or by any Facility, or from any other property or asset (whether real, personal, or mixed) in which any company has or had any interest, or any geologically or hydrologically adjoining property, whether by any Company or any other Person."

vii.     "(g) Each company has delivered to Buyer true and complete copies and results of any permits, licenses,

46

correspondence, notices and documents, including any reports, studies, analyses, tests, or monitoring possessed, controlled or initiated by such Company pertaining to Hazardous Activity in, on, or under or from the Facilities, or concerning compliance by the Business, the Assets used in or for the Business or such Company or any other Person for whose conduct it is or may be held responsible, with Environmental Laws." (PEI Ex. 1 at § 6.22.)

e.    Section 6.18 provides, "Except as set forth in Schedule 6.18, (a) no Proceeding involving or related to any Company, the Business or the Assets is currently pending; (b) no Judgment involving or related to any Company, the Business or the Assets is currently outstanding; and (c) no breach of contract, breach of warranty, tort, negligence, infringement, product liability, discrimination, wrongful discharge or other claim of any nature or related to the Business has been asserted or threatened against any Company at any time since January 1, 2003, which would be reasonably likely to materially impair Buyer's or such Company's ability to operate the Business as currently conducted or proposed to be conducted." (PEI Ex. 1 at § 6.18.)

<u>Factual Findings</u>

f.    In 1993 the NJDEP and the EPA issued an RCRA permit to Casie authorizing the conduct of hazardous waste activities at the facilities. This permit was reissued in 1997, and modified in June 2005 and January 2010. (PEI Ex. 30 at 7.)

g.    On October 10, 2006, the Call Companies received notification from the EPA Compliance Officer that the Companies' oil reclamation process might subject it to liability.

h.    Consequentially, the Call Companies were aware of their potential liability with respect to the Companies' oil reclamation processes.

i.    The Call Companies did not disclose this potential liability in Schedule 6.18.

j.    Brian Horne, a minority owner in the Companies who operated MART, remained in regular communication with the EPA as to MART's activities.

k.    In response to the October 10, 2006 notice of violation, Horne and Franklin Riesenberger, an environmental lawyer for the Companies,

communicated to the EPA that (1) they believed that they were not required to batch test MART's reclaimed oil before providing it to Casie as beneficial feedstock, as the EPA alleged that they were and (2) that they would begin to test batches of the reclaimed oil in order to avoid incurring liability.

l.      40 C.F.R. § 279.11 provides, "Used oil burned for energy recovery, and any fuel produced from used oil by processing, blending, or other treatment, is subject to regulation under this part unless it is shown not to exceed any of the allowable levels of the constituents and properties shown in Table 1."  40 C.F.R. § 279.11.

m.      Riesenberger believed that 40 C.F.R. § 261.1(c)(5)(i), 40 C.F.R. § 261.2 (e)(1)(ii) or 40 C.F.R. § 261.3(c)(2)(i) provided a valid defense, making 40 C.F.R. § 279.11 inapplicable to Casie/MART.

n.      Horne communicated this belief in letters not disclosed to the Court. Riesenberger later communicated these same beliefs through a series of letters in mid-2008, at which time PEI was in control of the Companies. (Call Ex. 100.)

o.      Call failed to communicate to PEI in Schedule 6.18 that an ongoing dispute existed between the Call Companies and the EPA regarding whether the Companies were violating 40 C.F.R.§ 279.11.

p.      The EPA filed suit in January 2010, asserting violations occurring between March 16, 2004 through August 1, 2009.  (See PEI Ex. 30 at 1),  The period is divided between dates during which Call had ownership of the Companies and dates that PEI had ownership of the Companies. (See PEI Ex. 30 at 18.)  PEI operated the Call Companies in violation of the regulation subsequent to March 30, 2007 until January 11, 2009.

q.       PEI is currently in the course of settling the matter with the EPA.

r.      The settlement agreement with the EPA does not entitle PEI to collect the full sum from Call.  We allocate only $350,000 out of a possible $750,000 to Call, given the length of time during which PEI itself operated the enterprise in violation of EPA regulations.  (PEI Ex. 31.)

## Conclusions

s.      Although Call failed to disclose this dispute in violation of Section 6.18, the improper practice continued after PEI's acquisition of the Companies.

Accordingly, Call is liable for only a portion of the settlement costs.

t.      The total value of the settlement of the lawsuit, as negotiated with the EPA, is $750,000. (See PEI Ex. 31.) Call is only chargeable with $350,000, pursuant to the terms of the settlement. (See id.) Since PEI had knowledge of the EPA's concerns in 2007 but continued its practices until 2009, PEI bears partial responsibility for costs associated with this violation.

u.      This conclusion is consistent with the doctrine of avoidable consequences, or the failure to mitigate damages. As noted above, under Pennsylvania law, mitigation is an affirmative defense, for which the defense here bears the burden of proof. See Prusky v. ReliaStar Life Ins.Co, 532 F.3d 252, 258 (3d Cir. 2008)(applying Pennsylvania state law).

4j.    *Humboldt SC-3 Centrifuge*

### Plaintiff's Claim

a.      Buyer claims that Seller is liable for payment of $110,565 required to secure the return of a Humboldt SC-3 centrifuge and spare rotating unit shipped to Wisconsin for repairs which were authorized by the Companies and made, but not satisfied, prior to the Closing Date in violation of sections 6.4, 6.5, 6.6, 6.8(a)-(b), 6.9, and 6.12 of the SPA.

### Contractual Provisions

b.      Under Section 6.4 of the SPA, the Sellers were required to provide financial statements that "fairly and accurately present the financial condition and the results of operations, changes in shareholders' equity and cash flows of the Companies as and at the respective dates of and for the period referred to in such Financial Statements, all in accordance with GAAP." (PEI Ex. 1 at § 6.4.)

c.      Section 6.5 of SPA requires that the books of account and other financial records of the Companies are "complete and correct and represent actual, bona fide transactions and have been maintained in accordance with sound business practices, including the maintenance of an adequate system of internal controls." (PEI Ex. 1 at § 6.5.)

d. Section 6.6 provides, "The Assets[12] (a) constitute all of the assets, tangible and intangible, of any nature whatsoever, necessary to operate the Business in the manner presently operated by the Companies and (b) include all of the assets of the Companies. (PEI Ex. 1 at § 6.6.)

e. Section 6.8(a) provides, "The Companies own good and marketable title to all of the Assets free and clear of Encumbrances[13] other than Permitted Encumbrances and those described in Schedule 6.8(a).  At the time of the Closing, all Assets shall be free and clear of all Encumbrances other than Permitted Encumbrances.  The consummation of the transactions contemplated hereby shall not render Buyer liable in any manner for any debt, liability, tax or obligation of the Companies, known or unknown, fixed or contingent, except for the Liabilities identified on Schedule 6.8(a) to this Agreement (all of which are reflected in the most recent Financial Statements of the Companies)."  (PEI Ex. 1 at § 6.8.)

f. Section 6.8(b) provides, "Except as set forth on Schedule 6.8(b), within five (5) years prior to the date hereof, the Companies have not (i) conducted business under or used any name (whether corporate or assumed) other than as set forth on Schedule 6.8(b), (ii) purchased or sold assets outside of the Ordinary Course of Business, or (iii) maintained, stored or otherwise located the Assets at any facility other than the Real Property designated on Schedule 6.7(a) or Schedule 6.7(b).  (PEI Ex. 1 at § 6.8.)

g. Section 6.9 provides, "Schedule 6.9 sets forth a true, complete and accurate list of all Tangible Personal Property and the location of the same setting forth with respect to each item of Tangible Personal Property on a tax basis and a GAAP basis, the costs, accumulated depreciation and date acquired.  Except as disclosed in Schedule 6.9, each item of Tangible Personal Property of the Companies is (or will be before the Closing Date) in good repair and good operating condition, ordinary wear and tear excepted, is suitable for immediate use in the Ordinary Course of Business and is free form latent and patent defects.  No such Tangible Personal Property is in need of repair or replacement other than as part of routine maintenance in the Ordinary Course of Business.  Except as disclosed in

---

[12]Assets are defined to include "machinery, tools, molds, tooling, dies, furniture, fixtures, leasehold improvements . . . owned by the Companies."  (PEI Ex. 1 at A-2.)

[13]Encumbrance is defined in the agreement as "any charge, claim, community or other marital property interest, condition, equitable interest, lien, option, pledge, security interest, mortgage deed of trust, right of way, easement. . . ." (See PEI Ex. 1 at A-4.)

Schedule 6.9, all Tangible Personal Property used in the Business is in the possession of the Companies." (PEI Ex. 1 at § 6.9.)

h.  Section 6.12 of the SPA provides that, "The Companies have no Liability except for Liabilities reflected or reserved against in the Financial Statements at December 31, 2005, all of which are accurately reflected on the Companies' books and records." (PEI Ex. 1 at § 6.12.)

### Factual Findings

i.  The Humboldt SC-3 Centrifuge was sent to Centrisys Corporation in August 2005 for repairs.  The centrifuge was to be converted from a two-phase centrifuge into a three-phase centrifuge.

j.  Although the unit was shipped in 2005, the Companies did not proceed with repairs until 2006.  When they decided to proceed with the conversion, however, the Companies were in arrears with Centrisys, the company conducting the conversion.  Centrisys, in discussions with Stephen Martinez, a former vice president of MART, stated that the centrifuge could not be converted until outstanding bills were satisfied.

k.  The Companies were satisfying the outstanding debt in $5,000 increments at the time of the acquisition.

l.  The date of commencement on the repairs to the Humboldt SC-3 Centrifuge is at issue.  Correspondence dated April 24, 2009, addressed to PEI, states that the work on the Humboldt was completed "prior to February 2007," pursuant to authorization that Centrisys received in 2006. (PEI Ex. 33.)

We find that the Humboldt SC-3 Centrifuge conversion was completed prior to February 2007 pursuant to the 2006 authorization.

### Conclusions

m.  Schedule 6.8, as produced to the Court, appears to be incomplete, as it refers to a "chart" that the Court does not have in its possession. (See PEI Ex. 1-1a at Schedule 6.8.)   Therefore, given the absence of testimony regarding this matter, the Court concludes that it cannot make a determination that section 6.8 was breached at this juncture.

n.  A breach of Section 6.9 occurred. Although the centrifuge is listed in Schedule 6.9, there is no indication in the schedule that the centrifuge was

51

in the process of being repaired or that payment for completed repairs was outstanding.  Nor did the schedule indicate that the Call Companies did not presently possess the centrifuge.

o.    The damages for this breach amount to $110, 565, the cost to PEI of procuring the centrifuge in good repair.

p.    Although some benefit was conferred to PEI in converting centrifuge, the defense has presented no evidence as to the value of the benefit conferred on PEI.  Further, the defense has offered no theory as to why the value of this benefit should discount the amount of the undisclosed liability that it is responsible for.  As a consequence, we cannot accurately gauge the portion of the repairs attributable to converting the  centrifuge from a two-phase centrifuge into a three-phase centrifuge.  Absent affirmative proof from the defendant on this issue, the Companies are responsible for the entire cost of the repairs.

4k.    *Yellow Iron Equipment*

Plaintiff's Claim

a.    Buyer claims that Seller is liable for $149,906 in damages PEI sustained because certain yellow iron equipment of the Companies was allegedly not in satisfactory condition on the Closing Date in alleged violation of one or more of the covenants, representations, and warranties contained in sections 6.6, 6.9, and 6.28 of the SPA.

Contractual Provisions

b.    Section 6.6 provides, "The Assets (a) constitute all of the assets, tangible and intangible, of any nature whatsoever, necessary to operate the Business in the manner presently operated by the Companies and (b) include all of the assets of the Companies." (PEI Ex. 1 at § 6.6.)

c.    Section 6.9 provides, "Schedule 6.9 sets forth a true, complete and accurate list of all Tangible Personal Property and the location of the same setting forth with respect to each item of Tangible Personal Property on a tax basis and a GAAP basis, the costs, accumulated depreciation and date acquired.  Except as disclosed in Schedule 6.9, each item of Tangible Personal Property of the Companies is (or will be before the Closing Date) in good repair and good operating condition, ordinary wear and tear excepted, is suitable for immediate use in the Ordinary Course of Business and is free from latent and patent defects.  No such Tangible Personal

52

Property is in need of repair or replacement other than as part of routine maintenance in the Ordinary Course of Business.  Except as disclosed in Schedule 6.9, all Tangible Personal Property used in the Business is in the possession of the Companies."  (PEI Ex. 1 at § 6.9.)

i.      Good repair is not defined in the appendix to the SPA.

ii.     Good operating condition is not defined in the appendix to the SPA.

iii.    Ordinary Course of Business is defined as follows: "an action taken by a Person will be deemed to have been taken in the Ordinary Course of Business only if that action: (a) is consistent in nature, scope and magnitude with the past practices of such Person and is taken in the ordinary course of the normal, day-to-day operations of such Person; (b) does not require authorization by the board of directors or shareholders of such Person (or by any Person or group of Persons exercising similar authority) and does not require any other separate or special authorization of any nature and (c) is similar in nature, scope and magnitude to actions customarily taken, without any separate or special authorization, in the ordinary course of normal, day-to-day operations of other persons that are in the same line of business as such Person."  (PEI Ex. 1 at A-8.)

d.       SPA 6.28 provides that, "No representation or warranty or other statement made by the Companies in this Agreement, the Schedules, or otherwise in connection with the transactions contemplated hereby contains any untrue statement or omits to state a material fact necessary to make such warranty or statement, in light of the circumstances in which it was made, not misleading.  Seller and the Companies have no Knowledge of any fact (other than pending legislation or general economic or industry conditions known to the public) that may materially adversely affect[14] the assets, business, prospects, financial condition or results of operations of the Companies that has not been set forth in this Agreement or the Schedules hereto."  (PEI Ex. 1 at § 6.28.)

<u>Factual Findings</u>

e.       In July of 2007, PEI requested a determination of the cost required to bring

---

[14]The indemnification provision sought to be enforced by PEI provides that "'material adverse effect' and other similar materiality qualifications shall be excluded when determining whether there has been a breach of a representation or warranty for which Buyer is entitled to indemnification under this Section 11."  (PEI Ex. 1 at § 11.1.)

certain pieces into "normal operating condition." At the time the estimate was conducted, the equipment was being used for its ordinary purposes. (See PEI Ex. 34.)

f.    The estimated repairs were never made. (See Trial Tr. vol. II, 210, November 15, 2011.)  Indeed, PEI had a full-time, qualified mechanic on the payroll for the purpose of keeping the equipment in good repair.  (See Trial Tr. vol. II, 211, November 15, 2011.)

g.    The equipment was in good repair and good operating condition when turned over to PEI.  In fact, as Martinez testified, the equipment remained in use at least until March 2009, when Pure Earth terminated Martinez. (See Trial Tr. vol. II, 210, November 15, 2011.)

h.    Call had no knowledge of any need for any repairs to the yellow iron equipment detailed in PEI Ex. 34 since the equipment was in good repair and in good operating condition.

<u>Conclusions</u>

i.    Neither "good repair" nor "good operating condition" are defined in the SPA.   Under Pennsylvania law, "if left undefined, the words of a contract are to be given their ordinary meaning." Kripp v. Kripp, 849 A.2d 1159, 1163 (Pa. 2004).  As a result, giving these words their ordinary meaning, we find that the equipment was "in good repair" and in "good operating condition" if, at the time of the acquisition, it was capable of performing its intended functions without mechanical repair.[15]  We find that the yellow iron equipment at issue was in good repair and good operating condition, within the meaning of Section 6.9, and, in fact, continued in use at least until 2009.

j.    PEI has not established this claim.  The machinery, as it was rendered to Buyer by the Seller, was listed as assets and were rendered in the condition necessary operate the business in the manner that Call had operated them. Although PEI contends that the machinery was not in satisfactory condition, this claim is baseless.  The equipment remained in regular use for at least two years after the acquisition and has never been repaired. Had repairs been necessary, they would have been performed by PEI's full-time repair technician.  Consequently, no breach of Section 6.6 has occurred.

---

[15] No information was provided to the Court regarding course of performance, course of dealing, or usage or trade regarding the meaning of this term.

k.        We also find that Call did not make any untrue statements, omit material facts, or make false warranties to Pure Earth in the SPA. No need for repairs existed. Moreover, since no repairs to the equipment were necessary, Section 6.28 was not breached.[16]

*4l.*    *Accounting Fees*

Plaintiff's Claim

a.        PEI claims Seller should be liable for $85,678 in professional fees incurred by PEI for accounting work PEI was required to perform due to the inadequacy of the books and records of the Companies, which is alleged to constitute a violation of sections 6.4, 6.5, 6.12, and 6.13 of the SPA.

Contractual Provisions

b.        Under Section 6.4 of the SPA, the Sellers were required to provide financial statements that "fairly and accurately present the financial condition and the results of operations, changes in shareholders' equity and cash flows of the Companies as and at the respective dates of and for the period referred to in such Financial Statements, all in accordance with GAAP." (PEI Ex. 1 at § 6.4.)

c.        Section 6.5 of SPA requires that the books of account and other financial records of the Companies are "complete and correct and represent actual, bona fide transactions and have been maintained in accordance with sound business practices, including the maintenance of an adequate system of internal controls." (PEI Ex. 1 at § 6.5.)

d.        Section 6.12 of the SPA provides that, "The Companies have no Liability except for Liabilities reflected or reserved against in the Financial Statements at December 31, 2005, all of which are accurately reflected on the Companies' books and records." (PEI Ex. 1 at § 6.12.)

e.        Section 6.13 of the SPA provides, "Except as provided in Schedule 6.13:

        i.      "(a) The Companies and Seller (with respect to the Business) have timely filed all Tax Returns that were required to be filed. All such Tax Returns were true, correct and complete and have been prepared in compliance with all Legal Requirements. All Taxes owed by the

---

[16]This claim was initially raised in Plaintiff's pre-trial memorandum.

Companies and Seller (with respect to the Business)(whether or not shown on any Tax Return) have been paid.  No penalty, interest or other charge is or will become due with respect to the late filing of any such Tax Return or late payment of any such Tax.  None of the Companies nor Seller (with respect to the Business) is currently the beneficiary of any extension of time within which to file any Tax Return.  No claim has ever been made by a Governmental Body in a jurisdiction where a Company or Seller (with respect to the Business) does not file a Tax Return that it is or may be subject to taxation by that jurisdiction.  No Company or Seller (with respect to the Business) is liable for any Tax as a transferee or successor."

ii.  "(b) The Companies and/or Seller (with respect to the Business) (i) have withheld from any employee, customer, independent contractor, creditor, shareholder and any other applicable payee proper and accurate amounts for all taxable periods in compliance with all Tax withholding provisions or other requirements of applicable federal, state, local and foreign laws, (ii) have remitted, or will remit on a timely basis, such amounts to the appropriate taxing authority, and (iii) have furnished or been furnished properly completed exemption certificates for all exempt transactions."

iii.  "(c) No audit or other examination of any Tax or Tax Return of the Companies or Seller (with respect to the Business) is presently in progress and none of the Companies, Seller (with respect to the Business) nor any director or officer (or shareholder responsible for Tax matters) of the companies expects any Governmental Body to assess any additional Taxes for any period for which Tax Returns have been filed.  No foreign, federal, state or local Tax audits, administrative Tax proceedings or judicial proceedings are pending or being conducted with respect to the Companies.  None of the Companies, Seller (with respect to the Business) nor any director or officer (or shareholder responsible for Tax matters) of the Companies have received from any foreign, federal, state or local taxing authority (including jurisdictions where the Companies have not filed Tax Returns) any (i) notice indicating an intent to open an audit or other review or investigation; (ii) request for information related to Tax matters; or (iii) notice of deficiency or proposed adjustment

56

for any amount of Tax proposed, asserted or assessed by any taxing authority against the Companies, and none of the Companies, Seller (with respect to the Business) nor any director or officer (or shareholder responsible for Tax matters) of the Companies expects any such items to be forthcoming."

iv.    (d) Schedule 6.13: (i) lists all federal, state, local and foreign Tax Returns filed with respect to the Companies (or Seller with respect to the Business) for taxable periods ending on or after January 1, 2003; (ii) indicates those Tax Returns that have been audited; (iii) indicates those Tax Returns with respect to which audits have been closed, (iv) indicates those Tax Returns that currently are the subject of an audit; and (v) identified each federal, state and local Tax election which has been made by each of the Companies and Seller (with respect to the Business). . . ."

v.    (f) No assessments or deficiency for any Tax has been proposed, asserted or assessed against any Company or Seller with respect to taxable periods ended on or before the Closing Date which has not been resolved, paid in full or fully reserved in accordance with GAAP in the Financial Statements.  There are no liens for Taxes upon the assets of the Companies, other than liens for Taxes not yet due and payable.  Each of the Companies has fully accrued or reserved in the Financial Statements all Taxes of such Company for any periods prior o the Closing Date that are not yet due and payable as of the Closing Date and has made adequate provision in the Financial Statements for all current Taxes and assessments for which such Company is or may be held liable, and the unpaid Taxes of the Companies and/or Seller (with respect to the Business) (i) did not on December 31, 2006 and do not exceed the reserve for Tax liability (rather than any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the December 31, 2006 balance sheet of the Companies included in the Financial Statements, and (ii) do not exceed the reserve as adjusted for the passage of time through the Closing Date in accordance with past customs and practice of the Companies and/or Seller (with respect to the Business) in its filing its Tax Returns.  Since December 31, 2005, neither the Companies nor Seller (with respect to the Business) has incurred any liability for Taxes arising from

57

extraordinary gains or losses, as the term is used in GAAP, outside the Ordinary Course of Business of the Companies.

vi.  (g) Each Company has disclosed on its federal income Tax Returns all positions taken therein that could give rise to a substantial understatement of federal income Tax within the meaning of Section 6662 of the Code. . .

vii.  (m) None of the Companies nor Seller (with respect to the Business) has (i) consented at any time under former Section 341(f)(1) of the Code to have the provisions of former Section 341(f)(2) of the Code apply to any disposition of any assets ; (ii) agreed to make any adjustment under Section 481(a) of the Code by reason of a change in accounting method or otherwise; (iii) made an election to treat any asset as owned by another person pursuant to the provisions of former Section 168(f) of the Code or as tax-exempt bond financed assets that directly or indirectly secure any debt the interest on which is tax exempt under Section 103(a) of the Code; (iv)acquired or owned any assets that directly or indirectly secure any debt the interest on which is tax exempt under Section 103(a) of the Code; (v) made any of the foregoing elections or is required to apply any of the foregoing rules under any comparable foreign, state, or local Tax provision.  No Company will be required to include any amount in income for any taxable period ending after the Closing Date as a result of a change in accounting method for any taxable period beginning on or before the Closing Date or pursuant to any agreement with any Governmental Body with respect to any such taxable period.  No Company will be required to include in any period ending after the Closing Date any income that accrued in a prior period but was not recognized in any prior period as a result of the installment method of accounting, the completed contract method of accounting, the long-term contract method of accounting or the cash method of accounting. . . .

viii.  "(o) Each of the Companies and Seller (with respect to the Business) has made all payments of estimated and/or Composite Taxes required to be made under the Code and any comparable provision of state, local, and foreign law. . . ."

ix.  (t) "Neither Casie nor Rezultz has any 'Net Unrealized Built-In Gains' as that term is defined in Section 1374 of the Code and no Federal entity level Tax liability would be

incurred upon disposition of any of the assets or property of either Casie or Rezultz."  (PEI Ex. 1 at § 6.13.)

### Factual Findings

f.      Casie, MART, and Rezultz billed each other for services that each performed for the others, booked the services as revenue, but did not enter the corresponding data into accounts payable as expenses.  (Trial Tr. vol. I, 73, November 14, 2011.)

g.      PEI hired Ford Ali and Paul Alper to adjust the books and records as part of the process of creating  GAAP compliant financial statements.

h.      PEI produced invoices evidencing payment to Ventnor Investment Properties of $34, 967.12. (PEI Ex. 39.)

i.      PEI paid Ford Ali $50,711.05 in connection with adjusting the books and records to correct for this practice.  (PEI Ex. 41.)

j.      The total cost for adjusting the books and records was $85,678.17.

### Conclusions

k.      Under Section 6.4 of the SPA, the Sellers were required to provide financial statements that "fairly and accurately present the financial condition and the results of operations, changes in shareholders' equity and cash flows of the Companies as and at the respective dates of and for the period referred to in such Financial Statements, all in accordance with GAAP." (PEI Ex. 1 at § 6.4.)  In the present instance, the financial statements were not rendered to PEI in accordance with GAAP.  Therefore, a breach of Section 6.4 occurred.

l.      In order to remedy the breach, PEI hired Ford Ali and Paul Alper to adjust the books and records in accordance with GAAP.  Consequential damages under Pennsylvania law are recoverable for a breach of contract if they constitute "a natural result of breach, were reasonably foreseeable and contemplated by the party, and provable with reasonable certainty."  Smith v. State Farm Mut. Auto. Ins. Co., No. 11-7589, 2012 WL 508445, at *5 (E.D. Pa. Feb. 16, 2012)(citing Ferrer v. Trustees of the Univ.  Of Pa., 825 A.2d 591, 610 (Pa. 2002))(applying Pennsylvania contract law).  These damages were foreseeable given Call's knowledge of  PEI's intention to become public and the necessity for GAAP compliant financial statements in this process.  The damages for adjusting the books and records are

clearly a natural result of the breach, given that this measure was necessary in order to create replacement financial statements. Finally, the damages at present were calculated with reasonable certainty, based on the billing produced to the Court.   The breach resulted in damages in the amount of $85,678.17.[17]

## IV.   Defense Counterclaims

### Defendant's Claims

1.   Call claims that PEI breached their contract and warranty with Sellers by (1) omitting mention of an investigation by the New York City Business Integrity Commission ("BIC") into the operations of Juda Construction, Ltd. ("Juda"), a subsidiary of the Pure Earth, (2) misrepresented that Pure Earth had won a multi-million dollar contract to provide waste treatment and disposal services in connection with the World Trade Center site, and (3) made false statements about the amount of business that Pure Earth would bring to Call's Companies.  Defendant also claims that these underlying misrepresentations form the basis for a claim of securities fraud.

2.   Although the two legal claims are distinct, because their factual underpinnings are interrelated, our factual findings regarding both claims are summarized in one section below.

### Contractual Provisions

2.   Section 7.10 of the Stock Purchase Agreement, contains a representation and warranty from PEI that provides as follows:

Disclosure.  No representation or warranty or other statement made by Buyer in this Agreement, the Buyer Closing Documents or the Schedules or otherwise in connection with the transactions contemplated hereby contains any untrue statement or omits to state a material fact necessary to make any of them, in light of the circumstances in which it was made, not misleading.  (PEI Ex. 1 at § 7.10.)

3.   Section 7.8 of the SPA contains the following representation and warranty from PEI: Except as set forth in Schedule 7.8 (a) no Proceeding[18] involving, or related to

---

[17] This claim was initially raised in Plaintiff's pre-trial memorandum.

[18] "Proceeding" is defined as an "[a]ction, arbitration, audit, hearing, investigation, litigation or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private) commenced, brought, conducted or heard by, otherwise

Buyer or Buyer's business is currently pending.  (PEI Ex. 1 at § 7.8.)

4.      Schedule 7.8 to the SPA lists three matters identified as "proceedings" and five "judgments" which involved Juda Construction, Ltd. ("Juda"), a PEI subsidiary.

5.       The SPA contains an integration clause, which provides as follows:

> 14.6.  Entire Understanding: Amendment.  This Agreement, together with the Exhibits and Schedules hereto, states the entire understanding between the Parties with respect to the subject matter hereof and supersedes all prior oral and written communications and agreement with respect to the subject matter hereof.  This Agreement shall not be amended or modified except in a written document signed by all Parties. (PEI Ex. 1 at § 14.6.)

<u>Findings of Fact Regarding Breach of Contract/Warranty and Securities Fraud</u>

6.      In our January 13, 2011 Order, we found that the SPA was ambiguous as to whether or not it represented a fully integrated agreement, given the conflict between Section 7.10 and Section 14.6.  If the SPA was found to be a fully integrated agreement, the oral representations made to Call would not retain relevance to his contract claim.

7.      After full consideration of the  parol evidence presented at trial, we find SPA to be a fully integrated agreement.  Call presented no evidence on this issue, aside from his self-serving testimony that he believed the contract was not fully integrated.  We do not find this testimony persuasive and, in the absence of more convincing evidence, we conclude that the intent of the parties was to create a final and complete document.

8.      (1) Misrepresentations that Pure Earth had won a multi-million dollar contract to provide waste treatment and disposal services in connection with the World Trade Center site and (2) made false statements about the amount of business that Pure Earth would bring to Call's Companies are thus parol, and not viable claims for breach of contract/warranty.  In connection with the two parol frauds alleged, we find the following:
         a.                 World Trade Center

---

involving, any Governmental Body or arbitrator." (PEI Ex. 1 at A-7.)  "Governmental Body" is defined as: any (a) nation, state, county, city, town, borough, village, district or other jurisdiction; (b) federal, state, local, municipal, foreign or other government; (c) government or quasi-governmental authority of any nature (including any agency, branch, department, board, commission, court, tribunal or other entity exercising governmental or quasi-governmental powers); (d) multinational organization or body, (e) body exercising, or entitled or purporting to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power; or (f) official of the foregoing.  (PEI Ex. 1 at A-5.)

     I.         Call's beliefs, and Call's beliefs alone, led him to conclude that the press release describing a $22 million project indicated the PEI had secured the WTC project.  (See PEI 62.)

     ii.       Neither Alsentzer nor Kopenhaver, nor anyone engaged by PEI, affirmatively asserted to Call that PEI had secured the WTC project.

     iii.      The press release at issue concerned the Rego Park Project in Queens, NY.

b.      Call was not promised that PEI would deliver any specified amount of business to the Call Companies.

c.      The only remaining viable misrepresentation claim that concerns the failure to disclose the existence of the investigation of Juda.  The remainder of our factual analysis concerns these events.

9.     Juda was a trucking operation engaged in the hauling of waste materials that originally had permits to operate in New York City, which was an important market that Call wanted his Companies to enter at the time of contract.  Juda was acquired by PEI in January 2006.

10.    The New York Business Integrity Commission ("BIC") is authorized and charged with investigating and making determinations of  registration applications for companies seeking to engage in the hauling of waste or other debris in New York City.  In particular, the BIC makes determinations regarding whether an organization will be permitted to operate as a trade waste business "engaged in the removal of waste materials resulting from building demolition, construction, alteration or excavation."  (Call Ex. 69 at 1.)  The registration allows an organization to become exempt from licensing requirements that apply to businesses hauling other types of waste.  (Id.)  In making its determination, the BIC scrutinizes an applicant's business integrity.  (Id.)

11.    On August 25, 2005, the BIC ordered that a monitor be put in place "to monitor and investigate all aspects of Applicant's business and operations."  (Call Ex. 50 at 15a.)  Juda, and subsequently PEI, were obligated to pay all costs incurred by the monitor, including salary, expenses and the "cost of independent investigators."  (Id. at 15c.)  The cost in salary was approximately $80,000 to $90,000 per year.  (Trial Tr. vol. I, 221, November 14, 2011.)  The monitor received broad authority, including the power to compel testimony under oath, to require the production of documents, unrestricted access to all personnel files, and advance notice of the intent to hire personnel with full access to the prospective employee's application materials.  (Id. at 15d, e, f.)

The Order specifically explicitly prohibited Juda from associating with certain crime figures. Juda concurred in the imposition of this condition.  (Id. at 2.)

12.     The decision to install a monitor resulted from several connections between the then principal of Juda, Nicholas Paniccia, and questionable figures.  In the course of evaluating the original claim of registration, the Commission learned that Paniccia was engaged in business ventures with Thomas and Joseph Attonito and Christopher Uzzi.  The Commission had previously considered and denied the application of Whitney Trucking, owned by Joseph and Thomas Attonito, given what it discovered of its principals.  In particular, the Commission found that Thomas Attonito had been convicted of perjury. Furthermore, Joseph Attonito and Christopher Uzzi had long criminal histories, including convictions for racketeering and extortion.  Moreover, Whitney was under investigation for criminal charges relating to illegal dumping.  (See Call Ex. 63 at 7 and  n. 2.)  Paniccia testified before the Commission that he had terminated all business relationships with the Attonitos and Uzzi.  Juda was issued a registration order based on this representation.  The order contained several conditions, including several which prohibited Juda from associating with or employing Joseph or Thomas Attonito.  In addition, the order mandated the installation of a monitor to scrutinize Juda's character, honesty, and integrity.  (See id. at 8.)  Juda was further required to pay the monitor's salary and agreed not to terminate the monitor absent the consent of the BIC.

Pure Earth acquired Juda Construction on January 19, 2006.  Upon acquisition of Juda, PEI became the applicant before the BIC. (Call Ex. 63 at n. 18.)

13.     Several months after the January 2006 acquisition of Juda, Alsentzer learned of the presence of the BIC monitor.  Thus, Kopenhaver and Alsentzer knew of the presence of the monitor for at least thirteen months prior to PEI's acquisition of the Companies.  (See Trial Tr. vol. I, 202, November 14, 2011.)  Nonetheless, PEI failed to disclose the presence of the BIC monitor to Call prior to the execution of the SPA.  (See Trial Tr. vol. I, 202, November 14, 2011)

Curiously, "Thomas Attonito executed a consulting agreement with Pure Earth on the same day that Pure Earth acquired Juda." (Call Ex. 63 at 11.)  Indeed, given their preeminence in PEI's corporate structure, it is highly likely that Kopenhaver and Alsentzer either negotiated or approved the consulting agreement with Thomas Attonito.

The BIC found that Pure Earth deliberately concealed these business relationships with Uzzi and Thomas and Joseph Attonito during the pendency of the license application.  We find that Pure Earth deliberately concealed the presence of the monitor and the existence of these prohibited relationships from Call.  These omissions were significant.

14.     The  Second Circuit wrote with concern of the nature of the New York City waste removal industry in Sanitation and Recycling, Inc. v. City of New York, 107 F.3d 985 (1997).  This

"industry has been corruptly influenced by an organized crime cartel for many years. . . This targeted criminal cartel is a 'black hole in New York City's economic life.'" Id. at 989.

Given this background, we have no difficulty in crediting the testimony of Call that he would not have entered the contract if he had knowledge of the BIC monitor's presence.

15.  The information concerning the BIC investigation was clearly important to the ability of PEI to operate in the New York City market.

16.  Moreover, Call testified that the integrity of those that he contracted with was important, given the stringency of the NJDEP.  (Trial Tr. vol. II, 60, November 15, 2011.)  We credit this testimony.

17.  The language of Section 7.10 of the SPA, quoted above, was clearly an attempt to guard against misrepresentations regarding the warranties, particularly Section 7.8 of the SPA.

18.  On November 29, 2007, Juda attempted to withdraw its application for renewal of its registration with BIC. (See Call Ex. 61.)

19.  Despite the attempt to withdraw its application, the BIC considered its application and denied Juda renewal of its registration. The findings of the BIC were detailed in a report dated June 28, 2010.  (Call Ex. 63.)  The BIC found that Juda and PEI knowingly associated with convicted racketeers, maintained a hidden relationship with Joseph Attonito and Thomas Attonito, members of organized crime, and terminated the BIC monitor without the permission and consent of the Commission.  The Commission also concluded that the President of PEI, Christopher Uzzi, was a convicted racketeer, and that Juda and PEI made false and misleading statement[s] to the Commission." (Id.)  The Commission found that both Juda and Pure Earth lacked "good character, honesty, and integrity." (Id. at 21.)  The application of PEI and its subsidiary, Juda, to haul trade waste in New York City was denied, and consequently both companies were permanently barred from participating in such ventures in NYC.

20.  The BIC expressed concern about Pure Earth's ties to Thomas Attonito.  In particular, despite the order barring association with Attonito, the Commission found that, "[t]he evidence actually shows that Thomas A.'s business relationship with Pure Earth, American Transportation, and Juda was more extensive than Uzzi had represented." (Call Ex. 63 at 11.)  Despite Juda's agreement not to establish a business relationship with Thomas Attonito, the Commission found that Attonito's employment at Pure Earth as a consultant was related to Pure Earth's acquisition of Juda as was the employment of Uzzi and Paniccia by Pure Earth.  (Id.)  Moreover, the report of BIC also noted that William LeVan, Pure Earth's Vice President of Acquisitions, had been arrested and pled guilty to two counts of aiding, abetting, and willfully causing the making of false statements to a federally insured financial institution in violation of 18 U.S.C. § 1014, in connection with his submission of false tax returns.  (See id.)

21.     Alsentzer claimed that the decision to withdraw the application to the BIC was the product of a number of factors, rather than just the presence of the BIC monitor.  (Trial Tr. vol. I, 228-30, November 14, 2011.)  Alsentzer testified that an analysis revealed that it was more economical to use an outside trucking company rather than an internal company to conduct shipping.  Alsentzer also testified that union liability issues made the use of an outside trucking company more economical.  (Id.)

I do not accept Alsentzer's testimony as accurate and complete. He minimized the alarming warnings he received from PEI's consultant and Vice President for Acquisitions, William LeVan, that the Juda principals had deceived the monitor about the nature of the business relationship between Juda and Thomas Attonito.[19]  Nonetheless, Alsentzer's presentation on this issue is relevant to our resolution of the critical issue of credibility for his testimony provided insight into Alsentzer's ease in recasting events to present a convenient truth.  Indeed, this trait manifested itself throughout his testimony and this tendency contributes significantly to our inability to trust him.

22.     PEI also produced Joseph Kotrosis, its employee, to provide his analysis regarding whether it would be more economical to use a third-party subcontractor to conduct trucking operations, as an alternative to the company's use of Juda.  In support of his testimony, PEI produced his written analysis.  This analysis, which he undertook on September 10, 2007, the day he commenced employment with PEI, and completed three weeks later, was not persuasive.  The report was not even consistent with itself: putative total trucking costs for the same time period varied within the sections of the document by almost fifty percent.  (See Trial Tr. vol. II, 304 and 312, November 15, 2011.)

Indeed, after observing the witness on the witness stand, we have no difficulty in concluding that his analysis was neither independent nor accurate.  Indeed, he was a

---

[19]Specifically, Alsentzer recalled these events as "Mr. Levan told me that there was a monitor on the site that had asked him some questions about Pure Earth, and he relayed that to me and I said sure, I'd be glad to meet with him."  (Trial Tr. vol. I, 219, November 14, 2011.) LeVan described the events as follows: "I was drawn into a meeting with Mr. Paniccia and Mr. Uzzi with the monitor of which there was, you know, false statements made to the monitor. . . I immediately after leaving that meeting, not saying anything, walked out and called Mr. Alsentzer and said that we had a problem; . . . that they're lying to the - - to this person that was our monitor."  (Trial Tr. vol. II, 176, November 15, 2011.)  LeVan continued, "I made it aware to Mr. Alsentzer of the facts that were presented to me.  And I believe he took them seriously at the time because it was a serious matter." (Id., at 178.)

The subject of these discussions, the hidden relationship between Pure Earth and Thomas Attonito, are memorialized on pages 11 and 12 of Call Exhibit 63, the BIC report, and constitute a major reason for the BIC's denial of PEI's license application.  Alsentzer's description of these events, although sophisticated, dispassionate and professional, is false at its core.

subordinate employee who was directed to provide an analysis justifying the elimination of the trucking enterprise, and he did just that.

23. It is our clear conclusion that PEI principal reason in attempting to withdraw its application to the BIC was the BIC monitor's discovery of PEI's on-going business relationship with prohibited organized crime figures.

24. We reject Alsentzer's testimony the BIC monitor's presence at Juda did not constitute an investigation under the terms of the contract.  Alsentzer persisted that the only purpose of the monitor was to "a permit condition to ensure that compliance with a permit was being carried out by the company."  (Trial Tr. vol. I, 200-01, November 14, 2011.)   The mandated employment of a monitor to "monitor and investigate" a company's books, records, business contacts and its compliance with its agreement not to engage in business with organized crime figures cannot fairly be characterized as a "permit condition."  It is an investigation.

25. Call did not learn of the BIC monitor until after he was terminated by PEI.

26. Call remained both financially and emotionally invested in the growth of the former Call Companies, given his continued financial stake in PEI and his investment in the Companies.

27. No evidence was presented regarding the damages that Call suffered as a result of the alleged misrepresentations.

<u>Conclusion</u>

28. Our legal conclusion, based upon our factual conclusions above regarding the intent to create a fully integrated agreement, is that the SPA represents a fully integrated agreement. As such, (1) misrepresentations that Pure Earth had won a multi-million dollar contract to provide waste treatment and disposal services in connection with the World Trade Center site and (2) made false statements about the amount of business that Pure Earth would bring to Call's Companies are parol to the agreement.  These claims cannot be sustained with respect to a claim asserting breach of contract.

29. The only viable legal claim that remains with respect to breach of contract is that claim dealing with the BIC monitor.  In Section V, titled "Conclusions of Law," we address this claim in more depth.

30. The Court notes that specific contract language is at issue with respect to the contractual claim based on misrepresentation.  Call has alleged a breach of 7.10, on the basis of the warranty contained in Section 7.8 of the SPA.  The Court finds that the BIC investigation into Juda constituted a proceeding under the contract.

a.        A proceeding is defined in the SPA as "any action, arbitration, hearing, investigation, litigation or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body or arbitrator.". (See PEI Ex. 1 at A-8.) A governmental body is defined to include a "governmental or quasi-governmental authority of any nature (including any agency, branch, department, board, **commission**, court, tribunal or other entity exercising governmental or quasi-governmental powers)." (See id. at A-5.)

b.        BIC is a governmental body.  It is authorized by N.Y.C. Admin. Code §§ 16-505.

c.        No evidence of the definition of the meaning of the term investigation was offered to the Court, except for the self-serving testimony of Alsentzer. Alsentzer, when questioned about the meaning of the term, testified that he did not believe that the presence of a BIC monitor constituted an "investigation." (See Trial Tr. Vol. I, 200, November 14, 2011.) Without any credible evidence regarding the meaning of the term, we turn to the law regarding the construction of the meaning of terms included in contracts under Pennsylvania's jurisprudence.

d.        Under Pennsylvania law, "if left undefined, the words of a contract are to be given their ordinary meaning." Kripp v. Kripp, 849 A.2d 1159, 1163 (Pa. 2004).  The plain language definition of investigate is "to observe or study by close examination and systematic inquiry." See Merriam-Webster, http://www.merriam-webster.com. Given the unavailability of credible evidence on the meaning that the contracting parties assigned to the term, we turn to the ordinary definition of investigation. This definition plainly includes the BIC monitor, whose duties were to observe the activities of Juda, in order to monitor Juda's character, honesty, and integrity. Noteworthy is that the activities of the BIC monitor, FJL Associates, LLC, are described as an "investigation" by the BIC in its report. (See Call Ex. 69 at 9.)

## V.        Conclusions of Law Applicable to Plaintiff's and Defendant's Claims

*A. Adverse Consequences*

Pure Earth asserts claims for breach of contract, and seeks to (1) set off the amounts that

Call is alleged to owe Pure Earth against a promissory note issued to Call pursuant to the Stock

Purchase Agreement ("SPA") and stock issued to Call as a part of that agreement and (2) to collect

monetary damages from Call to the extent that the amounts found to be owed by Call exceed the value of the promissory note and stock.

Call's primary defense is aimed at proving the SPA was void ab initio due to fraud in the inducement.  On May 27 , 2010, we ruled that Defendant/Third Party Plaintiff's claims for fraud in the inducement could not stand.  (Doc. No. 33 at 9–15.)  However, Call continues to assert fraud as a contractual defense.  We will not address the legal arguments concerning the two parol frauds, as they are no longer at issue, given that the SPA was  a fully integrated agreement.  However, the misrepresentation by Buyer that no governmental investigations were currently ongoing, in breach of Section 7.8 of the SPA, remains viable.  Call contends that this misrepresentation constitutes fraud that vitiates the contract.

However, as noted in our earlier order, where a fraud claim is premised upon an alleged breach of contractual duties, and supporting allegations do not concern representations that are collateral to or extraneous to the terms of the parties' agreement, a cause of action in fraud can not go forth.  See Partners Coffee Co., 700 F. Supp. 2d 720, 733-34 (W.D. Pa. 2010).  This compels the conclusion that fraud in the inducement, where it cannot survive as a cause of action because it is in reality merely a recasting of a breach of contract claim, also cannot survive as a defense for the same reasons.  See Scott-Macon Securities, Inc. v. Zoltek Companies, 2005 WL 1138476, No 04-Civ- 4MBM, at *11 (S.D.N.Y. May 12, 2005).  As a result, the contract is not void ab initio based upon fraud in the inducement, on the basis of a breach of Section 7.8.

A separate question, however, is presented by whether PEI's breach of Section 7.10, in failing to abide by the warranty contained in Section 7.8, allows Call to avoid his contractual obligations.  Under Pennsylvania law, "a party who has materially breached a contract may not

complain if the other party refuses to perform his obligations under the contract." Ott v. Buehler, 373 Pa. Super. 515, 518 (Pa. Super. 1988).  In the alternative, "[t]he rule in Pennsylvania and elsewhere is that when parties to a bilateral contract each commit a material breach thereof the law will give relief to neither party." Automotive Devices Co. v. Automotive Devices Co. Of Pa., 292 F.2d 663 (3d Cir. 1961); see also ATF Trucking, LLC v. Quick Freight, Inc., No. 06-4627, 2008 WL 2940795 at *3 (E.D. Pa. July 28, 2008); Cottman Transmission Systems, Inc. v. Dubinsky, 550 F. Supp. 133, 136 (E.D. Pa. 1982); Restatement (Second) of Contracts § 237 ("it is a condition of each party's remaining duties to render performance to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time").

Ordinarily, this would lead the Court to conclude that a breach by PEI, if found to be material, meant that it could not collect under the adverse consequences provisions of its contract. However, the SPA contains language indicating that the warranties might be construed as covenants independent of one another.  The rule governing independent covenants is exactly contrary to the rule that provides for excuse of performance when a party materially breaches the contract; if promises are independent of each other, a party must perform his or her part of the contract when the time for performance has come, regardless of whether the other party has performed.  See Murray v. Iron Hall of Baltimore City, 43 W.N.C. 357, at *3 (Pa. Super 1897); 17 A. Am. Jur. 2d Contracts § 592 (2012).  Under Pennsylvania law, whether a provision of a contract is considered independent is to be determined "not alone from any particular words or phrases, but also from the nature of the transaction and the object of the parties as evidenced by their contract." Orr v. Greiner, 98 A. 951, 953 (Pa. 1916). However, the touchstone in determining whether a provision of

a contract constitutes an independent promise is the intent of the contracting parties.

The SPA contains conflicting language regarding whether the warranty provisions at issue should be considered independent covenants or are dependent covenants.[20]  Relevant to the determination at issue is the provision in the contract regarding the independence of each warranty from the others.  Section 14.5 of the SPA provides, "Independence.  Each representation, warranty, covenant, obligation and agreement contained in this Agreement is independent of all others and must be separately satisfied or complied with.  The representations, warranties, covenants, obligations and agreements made hereunder constitute bargained for assurances."  (PEI Ex. 1 at § 14.5).  However, other language that indicates that rather than being independent, the performances by the parties are dependent.  In particular, the language of Section 12.3, provides,

> "Conditions Precedent to the Obligations of the Seller: The obligation of the Seller to consummate the transactions contemplated in this Agreement shall be subject to the satisfaction, on or before the Closing Date, of each and every one of the following conditions, any or all of which Seller may waive in writing, in its sole and absolute discretion:
>
> > (a) Representations and Warranties: Each of the representations and warranties made by Buyer in this Agreement shall be true and correct as of the Closing Date with the same force and effect as if made on and as of such date (except that each representation or warranty qualified

---

[20] Neither party, at any point during this litigation, has flagged any contractual language at all relevant to this Court's determination of whether Call's obligation was dependent on or independent of any part of PEI's performance.  Broadly speaking, despite the duration of this litigation and the extensive opportunity to provide insight into the importance of specific contractual provisions, neither party analyzed in any meaningful way the conduct of the parties through the lens of the contractual provisions.  In contrast with most commercial litigation, in which the Court receives precise and defined views of the legal effect of conduct as measured by the contractual terms, the parties before us just did not address this issue, which was plainly important to the resolution of the present dispute.  While we would have preferred the benefit of the parties views in this area, they were not provided.

by materiality shall be true and correct in all respects on
and as of the Closing Date).

(PEI Ex. 1 at § 12.3.)  This language is inconsistent with the language provided in Section 14.5,

which renders each provision of the contract independent of all others.  In order to resolve this

inconsistency, we turn to canons of construction.

In particular, the canons of construction regarding general contract provisions and specific

contract provisions are germane.  As Corbin notes, "If the apparent inconsistency is between a clause

that is general and broadly inclusive in nature and one that is more limited and specific in its

coverage, the more specific term should usually be held to prevail over the more general term."  5-24

Corbin on Contracts § 24.23.  This canon of construction favors construing Call's obligation to

consummate the transactions as contingent upon the truth of the representations and warranties

contained in the agreement.  Given that the provision articulating the independence of all provisions

in the contract refers to "[e]ach representation, warranty, covenant, obligation and agreement

contained in this agreement," while Section 12.3 is specifically applicable to the representations and

warranties in the contract, we find that Call's obligation to perform was dependent upon the truth of

the representations and warranties.

This conclusion is supported by the other factors relevant in deciding whether the parties

intended to create independent covenants or dependent covenants.  While the plain language of the

contract is the primary indicia of intent to which this Court may refer, given the obvious ambiguity

noted above, other factors counsel in favor of finding that the intent of the parties was to make Call's

performance dependent upon the truth of the representations and warranties.  In particular, the law of

Pennsylvania, as described above,  requires reference to the nature of the transaction and the object of

the parties involved.  Orr, 98 A. at 953 (Pa. 1916).  Dependent promises in contract law of as those

promises that are essential to the contract, meaning that dependent promises are those that "go[] to the entire consideration of the contract." 17 A. Am. Jur. 2d <u>Contracts</u> § 592 (2012). The nature of the transaction in the instant case, the acquisition of Call's Companies by PEI and his acquisition of the stock of PEI in turn, counsels in favor of finding dependency rather than independence, given that the truth of the representations and warranties ensured that Call's consideration, PEI stock, remained of value. As observed above, Call's object was in part to expand the Companies reach into New York, meaning that an essential component of his reason for contracting was to achieve this goal; the truth of the representations and warranties was necessary to this end, as discussed above. Finally, the presumption in contract law runs against a finding of independent covenants, <u>see</u> Restatement (Second) of Contracts § 231; 15 Williston on Contracts § 44:6 (2011). As a result, we conclude Call's performance remained dependent on Pure Earth's obligations to conform the representations and warranties contained in the SPA.

Given this conclusion, the next step in the analysis is to determine whether PEI's breach of Section 7.10 constituted a material breach, such that Call would be absolved of performance. The factors that Pennsylvania courts consider in determining whether a breach of contract is material are:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected,
>
> (b) the extent to which the injured party can be adequately compensated for that part of that benefit of which he will be deprived,
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture,
>
> (d) the likelihood that the party failing to perform or offer to perform will cure his failure, taking account of all of the circumstances including any reasonable assurances, and

72

(e) the extent to which the behavior of he party failing to perform
or offer to perform comports with standards of good faith and fair
dealing.

See Oak Ridge Const. Co. V. Tolley, 504 A.2d 1343, 1348 (Pa. Super. 1985); see also Restatement

(Second) of Contracts § 241 (1981).

In the instant case, based upon the factors above stated, the failure to disclose the BIC

investigation constituted a material breach.   The first factor, concerning the extent to which Call was

deprived of his expected benefit in contracting, is apparent.   Call testified, and we find his testimony

credible, that knowledge of the presence of the BIC monitor would have affected his decision to enter

the contract. Call testified that the integrity of those that he contracted with was important, given the

stringency of the NJDEP.   Call further testified that entering the New York market was a large part of

his reason for contracting with PEI.

The second factor, considering the extent to which the injured party can be adequately

compensated for that part of that benefit of which he will be deprived, also weighs in Call's favor.

Call testified that, given his investment in a company that he began in 1978 with a single truck, he

was invested in the growth of the business and its entry into new markets.   However, the ability of

PEI to engage in trucking in the New York market, was eliminated by the decision of the Business

Integrity Commission's refusal to grant PEI necessary licenses.   While PEI officials testified that the

use of outside contractors was a more efficient means to engage in trucking in New York City, we do

not credit this testimony, given the inadequacy of the analysis conducted by Joseph Kotrosis.   While

Call did not present evidence of the economic damages caused by the loss of Juda Trucking, which

would have been useful in the analysis of compensability, it is plain that part of the benefit sought by

Call, rather than involving economic damages, involved seeing his company enter a new market.

While the third factor favors PEI, the final two factors weigh in favor of finding a material breach.  Evaluating whether PEI will suffer a forfeiture, it is plain that PEI will suffer some forfeiture, given that it will not be able to collect the damages above that it has proven.  However, weighing the final two factors in the analysis, it seems unlikely that PEI can or will cure, given that Juda has been precluded from entering the New York market by the ruling of the BIC which found extensive and undisclosed involvement with organized crime figures.  Moreover, almost five years have passed since the time of its initial breach.  The breach of good faith and fair dealing in the instant case is egregious, given the nature of the findings of the BIC monitor, and the extent and seriousness of the BIC investigation, which concluded that Juda was permeated by organized crime figures.  Consequently, despite the disposition of the third factor in the analysis, in light of the other factors at play, we easily find that this breach of Section 7.10 constituted a material breach of the contract.[21]

The material breach by PEI means that it cannot collect under the adverse consequences provisions of its contract.[22]   In Pennsylvania, a material breach of contract excuses performance by the non-performing party.  See Ott v. Buehler Lumber Co., 541 A.2d 1143, 1145 (Pa. Super. 1988).

---

[21] Finding the breach to be material is consistent with the finding that Call's performance was dependent upon PEI's performance of the representations and warranties, given the characterization of a dependent covenant is one that goes to the entire consideration of the contract, see 15 Williston on Contracts § 44:6, and the definition of materiality turns upon the extent to which the injured party will be deprived of the benefit which he reasonably expected.  See Oak Ridge, 504 A.2d at 1348.  While the definitions are not identical, there is substantial overlap in the two definitions.

[22] Section 12.3 makes it strange to treat this issue as one involving material breach, given that 12.3 makes PEI's performance of the warranties a condition precedent to the performance of Call under the contract.  It may be more apt to treat the issue as the failure of a condition precedent, which also excuses performance by Call.  However, the parties have not framed the issue as such, and given that the Court was instead presented with the issue of whether a material breach occurred, we find that, given its resolution that the provisions in question were dependent on one another, such a material breach occurred, excusing performance by Call.

In the alternative, "[t]he rule in Pennsylvania and elsewhere is that when parties to a bilateral contract each commit a material breach thereof the law will give relief to neither party." Automotive Devices Co. v. Automotive Devices Co. of Pa., 292 F.2d 663 (3d Cir. 1961); see also ATF Trucking, LLC v. Quick Freight, Inc., No. 06-4627, 2008 WL 2940795 at *3; Cottman Transmission Systems, Inc. v. Dubinsky, 550 F. Supp. 133, 136 (E.D. Pa. 1982). Consequently, it matters not for the purposes of determining whether PEI can collect on its claims for adverse consequences whether Call too breached the SPA; given that both a breach by PEI alone or a mutual breach does not allow PEI to collect any contractual damages, the Court finds that PEI's material breach of contract precludes it from collecting damages.[23]

### B.    Call's Claims

At the close of testimony, counsel for the Plaintiff moved for judgment pursuant to Rule 52(c). Under Rule 52(c), "If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 52(c). Plaintiff asserts that no claim for securities fraud can be maintained, given the absence of evidence regarding (a) loss causation and (b) damages. Similarly,

---

[23] As a sidebar, and in the interest of completeness, the Court notes the peculiar nature of the relationship between the parties makes the analysis more complicated in the present instance. As stated in the findings of fact, Call failed to learn of the breach until after his termination. See supra p. 70. Thus, while Pure Earth may argue that Call accepted the fruits of the agreement, and thereby waived any initial breach that PEI committed, "[a] party claiming waiver must show a 'knowledge of the facts basic to the exercise of the right [waived] and the intent to relinquish that right." Horton v. Horton, 254 Va. 111 (Va. 1997); see also Browning v. Rodman, 111 A. 877, 878 (Pa. 1920)(holding that "acts done in affirmance of the contract can amount to a waiver of the fraud only where they are done with full knowledge of the fraud and of all material facts, and with the intention clearly manifested of abiding by the contract.") Given that Call did not learn of the breach until after his termination, no waiver could have occurred.

Plaintiff asserts that no claim for contract damages can prevail given the absence of evidence regarding damages.

    *1.    Call's Breach of Contract/Warranty Claim*

Both of Call's claims, for contractual damages and for damages for violations of 10b-5, concern allegations of material misrepresentations, two of which are oral representations that preceded the execution of the contract, and one of which is contained in Section 7.8 of the SPA.  The three misrepresentations concern (1) an alleged misrepresentation that PEI had procured a contract to work on the World Trade Center, (2) an alleged misrepresentation about the amount of business that Pure Earth would bring to Call's Companies, and (3) an alleged material omission in the failure to mention an investigation by the Business Integrity Commission into the connections between Juda and organized crime.

While Call avers that all three claims constitute material misrepresentations that should vitiate the effect of the contract, Plaintiff argues that the SPA represents a fully integrated agreement, and that consequently, the alleged misrepresentations regarding the World Trade Center contract and the amount of business that PEI might supply to Call's Companies are parol to the contract, and thus cannot be considered by the Court.  This Court's factual finding that the intent of the parties was to create a fully integrated agreement, counsels in favor of a legal conclusion that the SPA is in fact a fully integrated agreement.

For the parol evidence rule to apply, there must be a writing that represents the "entire contract between the parties." Yocca v. Pittsburgh Steelers Sports, Inc., 578 Pa. 479, 497 (Pa. 2004). An integration clause stating that "a writing is meant to represent the parties' entire agreement is . . . a clear sign that the writing is meant to be just that and thereby expresses all of the parties' negotiations,

conversations, and agreements made prior to its execution." Id. at 498.  In the instant case, the SPA

contains an integration clause, which provides,

> "This Agreement, together with the Exhibits and Schedules hereto,
> states the entire understanding between the Parties with respect to
> the subject matter hereof and supersedes all prior oral and written
> communications and agreement with respect to the subject matter
> hereof.  This Agreement shall not be amended or modified except
> in a written document signed by all Parties."

(PEI Ex. 1 at § 14.6.)  Ordinarily, the presence of the integration clause would have strongly urged the

Court to conclude that the agreement represented an integrated agreement. Generally,  "[t]he intent of

the parties to a written agreement is to be regarded as being embodied in the writing itself.  The whole

instrument must be taken together in arriving at contractual intent."  Ferrer v. Trustees of the

University of Pa., 573 Pa. 310, 338 (Pa. 2002).

However, where a contract's language is ambiguous, "extrinsic or parol evidence be

considered to determine the intent of the parties." Id. at 339. A contract contains an ambiguity "if it is

reasonably susceptible of different constructions and capable of being understood in more than one

sense." Id.  Consequently, despite the presence of the integration clause, this Court determined that

the SPA was ambiguous, given the presence of Section 7.10.   (See Doc. No. 33.)   Section 7.10

provides,

> Disclosure.  No representation or warranty or other *statement* made
> by Buyer in this Agreement, the Buyer Closing Documents or the
> Schedules or otherwise in connection with the transactions
> contemplated hereby contains any untrue statement or omits to
> state a material fact necessary to make any of them, in light of the
> circumstances in which it was made, not misleading.

(PEI Ex. 1 at § 7.10.)  The ambiguity concerned whether the word statement can be read to mean oral

statements, as well as written statements. (See Doc. No. 33 at 10-11.)

In order to discern the meaning of ambiguous language, "[a]greements and negotiations prior to or contemporaneous with the adoption of a writing are admissible . . . to establish the meaning of ambiguous terms in the writing, whether or not the writing is integrated."  Martin v. Monumental Life Ins. Co., 240 F.3d 223, 233 (3d Cir. 2001).  In the present case, testimony was received from Call, to the effect that he wanted a "fair and protective" disclosure statement because so little due diligence had occurred prior to closing.  In support of his contention that the execution was rushed, Call produced a contemporaneous email by attorneys for Pure Earth, which stated that "time remains of the essence."  (Call Ex. 95.)  Call also testified as to the purported agreements and negotiations that took place prior to the execution of the SPA.  Call, however, failed to produce any convincing evidence that the agreement was meant to integrate prior negotiations between the parties.  Consequently, given the meager evidence presented to support the claim that 7.10 was meant to include prior oral representations to Call in the SPA, together with the legal presumption that an integration clause is meant to be a clear sign that the writing encompasses the parties' entire agreement, we can only conclude at this juncture that the SPA was a fully integrated agreement, and that Section 7.10 was not meant to integrate oral promises made to Call.

Once a writing is determined to be the parties' entire contract, the parol evidence rule applies and "evidence of any previous oral or written negotiations or agreements involving the same subject matter as the contract is almost always inadmissible to explain or vary the terms of the contract."  Yocca, 578 Pa. at 498.  "Where the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement."  Id. at 497. Only where "fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms and agreements cannot be added

to nor subtracted from by parol evidence." Id. at 436.  As a result, the alleged oral misrepresentations

regarding the procurement of the World Trade Center contract and the amount of business that PEI

would bring to the Call Companies are parol, and excluded from the consideration of the Court.  The

remaining misrepresentation claim concerns the violation of Section 7.10 in concert with Section 7.8,

in the failure to disclose the presence of a BIC monitor in Juda's operations.

Remaining, however, is Call's contract claim based upon the breach of Section 7.10, in

connection with the violation of the warranty contained in Section 7.8, which relates to the existence

of the BIC investigation, at the time of the execution of the SPA.   To prove a breach of contract

claim under Pennsylvania law, a party must establish (1) the existence of a contract, (2) a breach of

the duty imposed by the contract, and (3) resultant damages.  Corestates Bank N.A. v. Cutillo, 723

A.2d 1053, 1058 (Pa. 1999).  We have previously found that the breach of 7.8, in concert with 7.10,

constituted a material breach of the SPA.  As a consequence, Call has proven the first and the second

elements of the present claim.  However, Call has presented no proof of damages.  As a result, given

that Pennsylvania law integrates proof of damages as an element of the cause of action, Call's claim

for breach of contract fails as a matter of law.

We address, for the purposes of completeness, PEI's assertion of the affirmative defense

that "Call's claims are barred by his material breach of his obligations under the parties' agreement."

(See Doc. No. 34 at 12.)  However, after conducting an analysis under Pennsylvania state law, the

Court finds that the breaches committed by Call do not represent material breaches.  As noted above,

the factors governing whether a breach of contract is material are:

> (a) the extent to which the injured party will be deprived of the
> benefit which he reasonably expected,
>
> (b) the extent to which the injured party can be adequately

compensated for that part of that benefit of which he will be
deprived,

(c) the extent to which the party failing to perform or to offer to
perform will suffer forfeiture,

(d) the likelihood that the party failing to perform or offer to
perform will cure his failure, taking account of all of the
circumstances including any reasonable assurances, and

(e) the extent to which the behavior of the party failing to perform
or offer to perform comports with standards of good faith and fair
dealing.

See Oak Ridge, 504 A.2d at 1348; see also Restatement (Second) of Contracts § 241.  In the instant

case, these factors counsel against finding Call's breach material.[24]

The breaches PEI claims to have suffered do not constitute the whole of the benefit that PEI

expected, but rather constitute minor deviations from performance that can be cured through an award

of damages.  In that vein, although PEI alleges numerous breaches of contract, PEI can be adequately

compensated for the benefit of that which he has been deprived of, given that it has quantified its

damages in its complaint.  Moreover, while Call did not cure his failures, despite the notice he was

given, his behavior did not fail to comport with standards of good faith and fair dealing, as his

breaches were relatively minor and do not, with the small exception of the breach involving his use of

life insurance, appear to have been committed willfully, but instead appear to be the result of careless

---

[24] At this juncture, the obligations of PEI are subject to a condition precedent similar to
Call's condition precedent, mentioned earlier. (See PEI Ex. 1 at 28.)  However, given that PEI
seeks to enforce the contract at present, and in particular the provision regarding indemnification,
rather than to argue that the contract fails to exist due to the occurrence of a condition precedent,
the Court need not address Call's failure to fulfill a condition precedent, and the applicability of
this failure as excusing PEI's obligations for breach of contract.  Although as a technical matter,
PEI may have elected to use the failure of the condition precedent as a means of seeking
rescission, PEI appears to have elected to waive the failure of the condition precedent in order to
enforce the indemnification provision of the contract.

accounting.  As a result, despite the fact that Call breached the agreement, his breaches do not, to the

Court, represent material breaches.  Consequently, unlike Call, Pure Earth cannot claim that Call's

breaches bar his recovery.  However, Call cannot prevail on his breach of contract claim given his

failure to produce any evidence of damages.[25]

### 2. Securities Fraud

As stated above, Call has asserted a claim against the PEI Parties for alleged violation of

Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, promulgated thereunder.  A

Securities Fraud Claim under Rule 10b-5 has its origins in 15 U.S.C. § 78j, which provides,

> "It shall be unlawful for any person, directly or indirectly, by the
> use of any means or instrumentality of interstate commerce or of
> the mails, or of any facility of any national securities exchange...(b)
> To use or employ, in connection with the purchase or sale of any
> security registered on a national securities exchange or any security
> not so registered, or any securities-based swap agreement (as
> defined in section 206B of the Gramm-Leach-Bliley Act), any

---

[25]  In the course of pre-trial motions, PEI moved to exclude Call's only proffered evidence of damages, the expert testimony of Stephen Scherf.  (Doc. No. 71.)  We previously concluded that Scherf's testimony did not comply with the requisites of Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  (See Doc. No. 92.) Scherf's proposed testimony hinged upon the twin assumptions that at the time that Call was sold PEI stock, the stock was overvalued, and that the subsequent decline in value reflected the true value of the stock at the time that Call received it.  As evidence of damages, this would have meant that Call was entitled to receive the difference between what he believed he was receiving, or the value of the stock at the time that he purchased it, and the value of the stock as it stands today, which Scherf concluded represented its true value at the time of purchase.  However, Scherf's analysis regarding overvaluation was highly unreliable because Scherf neither reliably established the actual value of the stock nor properly attributed the fluctuations in price to the conduct of PEI.  (See Doc. No. 92.)  The basis for his expert opinion was therefore an assumption unsupported by a solid foundation, the type of opinion which could not properly be accepted as fact at trial.  Since Scherf's testimony could not be relied upon to establish the value of what Call actually received at the time  of contract or any subsequent loss in value, Call could not use it to establish damages under any theory at trial.  Moreover, Federal Rule of Civil Procedure 26(2) (B)(i), (ii) and (D)(i) precluded Scherf from altering or augmenting his opinion in any way.

> manipulative or deceptive device or contrivance in contravention
> of such rules and regulations as the Commission may prescribe as
> necessary or appropriate in the public interest or for the protection
> of investors."

15 U.S.C. § 78j.  Pursuant to this statutory authorization, the Securities and Exchange Commission

crafted Rule 10b-5, which provides that it is unlawful in connection with the sale or purchase of a

security "[t]o make any untrue statement of material fact or to omit to state a material fact necessary

in order to make the statements made, in light of the circumstances under which they were made, not

misleading."  17 C.F.R. § 240.10b-5(b).

In order to prove a claim for securities fraud, a plaintiff must establish (a) a material

misrepresentation or omission, (b) scienter, (c) a connection with the purchase or sale of a security,

(d) reliance, (e) economic loss, and (f) "loss causation," i.e., a causal connection between the material

misrepresentation and the loss.  McCabe v. Ernst & Young, LLP, 494 F.3d 418, 424 (3d Cir. 2007).

Plaintiff asserts that no claim for securities fraud can be maintained, given the absence of evidence

regarding (a) loss causation and (b) damages.

We address first the issue of damages in Call's securities fraud claim.  Proof of economic

loss is an element of a cause of action based on securities fraud.  In our November 14, 2011 Order, we

precluded the testimony of Stephen Scherf on the issue of damages and loss causation, finding that his

methodology was unreliable.  (See generally Doc. No. 92.)  While the defense presented Glenn

Josephs, an accountant who worked on the SPA and was present at the closing of the SPA, in an

effort to show that the Fifth Amendment to the SPA provided Call with less than he was entitled to as

a matter of the contract, this evidence did not establish damages because it did not pertain to the

securities fraud in question, and was not tethered to the misrepresentations that constituted Call's

securities fraud claim.  Instead, it dealt with allegedly erroneous calculations on the part of Pure Earth

82

in calculating the Net Asset Value calculations, which was meant to establish the true value of what

Call was entitled to receive from the contract.  Given the exclusion of Scherf's testimony, no evidence

was produced to show the actual value of what Call received.  As a result, no other evidence, expert

or otherwise, was presented by the defense in order to estimate the amount of damages suffered by

Call.[26]  Third Circuit law dictates that "plaintiffs alleging securities fraud rely on expert testimony to

establish both the fact of damage and the appropriate method of calculation."  Sowell v. Butcher and

Singer, Inc., 626 F.2d 289, 301 (1991).  Given the absence of evidence regarding damages, Call

cannot maintain an action for securities fraud.  See id. at 295.

Moreover, no evidence of loss causation was produced to establish the claim.  The loss

causation element is codified as an element of the Private Securities Litigation Reform Act

("PSLRA"), which provides, "the plaintiff shall have the burden of proving that the act or omission of

the defendant . . . caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-

4(b)(4).  The loss causation inquiry "typically examines how directly the subject of the fraudulent

statement caused the loss, and whether the resulting loss was a foreseeable

outcome of the fraudulent statement."  Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 222 (3d

Cir. 2006).  A plaintiff "does not meet the loss causation element if he fails to prove that the drop in

the value of a security is related to the alleged misrepresentation."  Id. at 223.  The loss causation

element is meant to "limit[] the circumstances in which an investor can sue over a failed investment,

so that the individual allegedly responsible for the misrepresentation or omission does not become an

---

[26]In fact, Call admitted during cross examination that the actual share price at the time of
the closing was around $8 per share, although he negotiated the pricing on the shares to $5 per
share, in order to receive more shares.  This evidence tends to suggest that the actual value of
what Call received was not less than what he believed he was receiving.  (Trial Tr. Vol. II, 103-
04, November 15, 2011.)

insurer against all the risks associated with that investment." <u>McCabe</u>, 494 F.3d at 425 n.3.

Plaintiff proceeded to trial on a non-typical loss causation claim. While typical loss causation requires proof of "fraud on the market," meaning that a defendant made material misrepresentations or omissions in order affect the price of a publicly traded stock, non-typical loss causation involves claims alleging that misrepresentations to a plaintiff induced that plaintiff into entering into a private transaction. <u>See McCabe v. Ernst & Young, LLP</u>, 494 F.3d 418, 425 n. 2 (3d Cir. 2007). In a typical loss causation case, the plaintiff shareholder "alleges that a fraudulent misrepresentation or omission has artificially inflated the price of a publicly-traded security . . . [and] the revelation of that misrepresentation was a substantial factor in causing a decline in the security's price." <u>Id.</u> at 425. Non-typical loss causation falls into a "less rigid pattern." <u>Id.</u> at 426. In particular, case law suggests that in a non-typical case, the court examines "the difference between (1) the price at which a trade has been executed and (2) the price at which it could reasonably have been executed." <u>Id.</u> at 426. In other words, non-typical loss causation is distinct from transaction causation, in that, other than proving that material misrepresentations induced the transaction, the plaintiff must further prove that the material misrepresentations also caused the loss suffered. <u>See</u> <u>McCabe</u>, 494 F.3d at 430-31; <u>see also</u> <u>Dura Pharmaceuticals, Inc. v. Broudo</u>, 544 U.S. 336, 341-42 (2005)(noting that both transaction causation and loss causation are necessary elements of a securities fraud claim).

In <u>Dura</u>, the Supreme Court explained that proving that share price was inflated at the time of purchase alone is not sufficient to establish loss causation, given that a subsequent diminution in value might not be a consequence of the misrepresentation. Instead, "[w]hen the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier

misrepresentation, but changed economic circumstances, changed investor expectations, new

industry-specific or firm-specific facts, conditions, or other events, which taken separately or together

account for some or all of that lower price." Id. at 342-43.  Although Dura dealt with a typical loss

causation framework, the Third Circuit has found the logic of Dura persuasive in examining a non-

typical loss causation case.  McCabe, 494 F.3d at 433.  In particular, the Third Circuit has found that

it is not sufficient to prove that there is a disparity between the price paid at the time of purchase and

the "true value" of a stock, but must also show that the misstated or omitted facts caused the decline

in the value of the stock.  Id. at 434.

    While Defendants, through Scherf, established the value of what was supposed to be

received by Call, the second step in the analysis was not completed.  Scherf, by reason of the

unreliability of his report, was not permitted to testify as to the actual value of what Call received as a

result of the SPA.  Call presented no other evidence to establish the actual value of what he received

at the time of the SPA.  Moreover, aside from the failure to provide evidence that the actual value of

what was received, or the "true value" of the stock, the Defendants further failed to produce any

evidence that the decline in the stock price was a result of the misrepresentations by PEI.  Under

Third Circuit case law, "[b]ecause a decreased price might simply be a reflection of changed

economic circumstances, it is important for a plaintiff to provide causation evidence, usually through

an expert opinion, to support the loss causation factor."  Jasin v. Kozlowski, No. 1:04-cv-2188, 2011

WL 3627322, at *4 (M.D. Pa. August 17, 2011); see also Sowell, 626 F.2d at 301.  In the instant case,

applying this rationale to the non-typical loss causation framework, Call failed to show that the value

of the stock at the time of purchase was overvalued in any way, meaning that even if Call established

that the stock was worthless in 2009, when he was terminated, he cannot establish that the initial

value he received did not accurately reflect the value of the stock at the time.  For the foregoing reasons, Call's securities fraud claim cannot succeed.

For these reasons, we find in favor of Defendant Call on Plaintiff PEI's claims, and in favor of Counter-Claim and Third Party Defendants PEI, Alsentzer and Kopenhaver on Counter-Claim Plaintiff Call's claims.  Neither party is entitled to financial recovery.  The Clerk of Court is directed to close this matter for statistical purposes.

BY THE COURT:

/s/ Legrome D. Davis

Legrome D. Davis, J.